### THE UNITED SOCIETY *against* THE PRESIDENT, DIRECTORS AND COMPANY OF THE EAGLE BANK OF NEW-HAVEN.

Where an ecclesiastical society had subscribed for shares in the *Eagle Bank,*
  by virtue of the provision for such subscription in the charter of the bank ;
  the bank afterwards became insolvent ; and such society thereupon gave

due notice of its intention to withdraw the shares so subscribed; it was *New-Haven*, held, that such society, by virtue of its subscription, became a stockholder July, 1829. in the bank, and part of the corporation, and consequently, after the insolv- ─────── ency of the bank, was incapable of withdrawing its shares, or of recovering United Society the amount as a debt against the bank. *v.* Eagle Bank.

THIS was an action of *assumpsit,* in two counts; the first, general, for money had and received for the plaintiffs' use; the second, special, for the amount of 72 shares of stock, subscribed by the plaintiffs, and demanded of the defendants, after six months notice of their intention to withdraw them.

The plaintiffs are, and for more than twenty years past, have been, an ecclesiastical society, duly incorporated, and located in *New-Haven* in this state. In pursuance of the provisions in the charter of the *Eagle Bank,* authorizing subscriptions from the funds of any ecclesiastical society in this state, and on the terms therein prescribed, the plaintiffs, at the several times specified in the second count of their declaration, subscribed, and paid from their funds, for seventy-two shares, at the rate of 100 dollars for each share; which subscriptions and payments were received by the defendants. The plaintiffs afterwards received the dividends, semi-annually declared, by the defendants, on these shares, at the rate of six *per cent. per annum* and upwards, until the 20th of *September,* 1825; when the plaintiffs gave notice to the directors of the *Eagle Bank,* that they should withdraw their shares and the money paid thereon, at the expiration of six months from that time. At the expiration of said six months, the plaintiffs demanded payment of said shares, at the rate at which they had been received; and the defendants, then, and have at all times since, refused payment. Previous to the 20th of *September,* 1825, the defendants became, and have ever since been, insolvent, and wholly unable to pay their bills and the deposites in the bank.

At the session of the General Assembly of this state, in *October,* 1811, the defendants were constituted a body politic and corporate. By the 1st section of the charter of incorporation, it was enacted: " That it shall be lawful to establish a bank at *New-Haven,* the capital stock whereof shall be divided into shares of one hundred dollars each, which shall be transferable according to such rules as may be established by the directors; and the subscribers to the same, their successors and assigns, shall be, and are hereby constituted a body politic and corporate, by the name of *The President, Directors and Com-*

*New-Haven,*
*July, 1829.*

*United Society*
*v.*
*Eagle Bank.*

*pany of the Eagle Bank at New-Haven."* The 2nd article of the 2d section contained the following provision : " All stockholders shall be entitled to vote at any general meeting, in person or by proxy ; and one vote shall be allowed for each share ; but no transfer shall be allowed of any share until the expiration of six months from the time of subscription." By the 6th article of the 2nd section, it was declared, that bills or notes of the corporation " shall be obligatory on the corporation, according to the tenor thereof." By the 3rd section, it was provided : " That the capital stock of said bank shall consist of five thousand shares ; and the stockholders, at a general meeting, may authorize the directors to open new subscriptions, for such amount as they may deem expedient, not exceeding two thousand five hundred shares." By the 6th section, it was provided : " That in addition to the subscription before authorized, the state of *Connecticut* shall have a right, at any time, to subscribe to the said bank, at the rate of one hundred dollars for each share ; and whenever the state shall have subscribed five hundred shares, and paid for the same, they shall have a right of appointing two additional directors of said bank." And by the 7th section, it was enacted : " That in further addition to the subscriptions before authorized, the said bank shall, at all times, be open for subscriptions, at the rate of one hundred dollars for each share, from the school fund of of this state, or from the funds of any college, ecclesiastical society, school or corporation for charitable purposes within this state. Provided, nevertheless, that shares so subscribed shall not be transferable, but may, at any time, be withdrawn, on six months notice to the directors." The 8th and last section provided : " That no share or shares shall give to any stockholder a right to vote, unless the same shall have stood in his name, on the books of the bank, at least three calendar months previous to the time of voting. (*a*)

A case embracing the facts above stated, in connexion with the charter of the *Eagle Bank,* was made and reserved for the consideration of this Court.

*N. Smith* and *R. S. Baldwin,* for the plaintiffs, after remarking that the case must be decided with reference to the original charter of the *Eagle Bank,* which, though reduced in form, at

(*a*) The references here made, are to the *original* charter, as entered upon the public records, and printed with the laws of *October* session 1811, and not to the *abridgment* in the statute book, revision of 1821.

the revision of 1821, for the mere purpose of saving letter-press and paper, was not varied in substance, contended, 1. That whatever the relation of ecclesiastical societies to the *Eagle Bank* may be, they constitute no part of the corporation. By the 1st section, the holders of the transferable stock are constituted the members of the corporation; and to these stockholders all the general powers of a corporation are given. By the 2nd article of the 2nd section, the power of voting is limited to the holders of transferable stock. The provisions of the 3rd, 6th, 7th and 8th sections tend to confirm the proposition, that the holders of transferable stock constitute the body politic. On them exclusively are bestowed all the powers, rights, privileges and immunities, which are necessary and proper for a bank. The charter confers on ecclesiastical societies no one corporate function; but simply gives them the privilege of making subscriptions at pleasure, and withdrawing them on six months notice. This privilege was not thought to be an unreasonable one. A bank managing its business prudently, and acting up to the intent of its creation, would always preserve its capital entire. Its stock would not be materially diminished by losses, because its loans would be well secured; nor would it be augmented, because its profits would be regularly divided among its stockholders. This being the case, the share withdrawn is of precisely the same value as the share subscribed. The legislature, not foreseeing or suspecting the catastrophe, which has since taken place, did not deem it necessary to make any provision in relation to it. The expression " shares may be withdrawn," is slightly figurative, the representative being put for the thing represented. Hence the phrases in the charters of the several banks in this state, allowing societies, &c. to " withdraw the shares so subscribed"—" the money so subscribed"—" their moneys so subscribed"—" moneys for such shares"—" moneys subscribed and paid in" &c.—are convertible terms, and import the same thing.

These bank charters, in reference to the provision which they make for investing the funds of religious, literary and charitable institutions, have all one common purpose in view, the advancement of the public interest, by promoting the objects of those institutions. The various charters, therefore, *quoad* this privilege, are literally and technically *in pari materia*. *Rex* v. *Loxdale* & al. 1 *Burr* 447. *Doug.* 30. 1 *Term Rep.* 53. 3 *Term Rep.* 135. 1 *Swift's Dig.* 11.

*New-Haven,*
July, 1829.

United Society
*v.*
Eagle Bank.

*New-Haven,*
*July, 1829.*

United Society
*v.*
Eagle Bank

The withdrawing of the funds of these privileged institutions has always been understood to import a withdrawing of the money invested. Such invariably has been the practical construction. All the banks have adopted and been guided by it. The rule on this subject, has, in practice been a uniform one, regardless of the variations of phraseology in the several charters.

It is a decisive objection to the construction claimed by the defendants, that it is *utterly impracticable.* If a holder of one of the transferable shares could lawfully withdraw *his share*, it would break up the institution as a bank. It would be necessary to ascertain the precise condition of the bank ; as the withdrawing stockholder would take only a proportionable part of the effects of the bank after its debts were paid. This would render it necessary to sell the real estate ; to collect the credits ; and in short, to convert the whole property of the bank into cash. This might be required every day in the year. Besides, the societies having no voice in the corporation, no right of access to its books, and no right to transfer their shares, if they could not withdraw the amount of their subscriptions, would be continually exposed to the rapacity of dishonest men, without possibility of redress.

The only practicable and consistent interpretation of the charter, is that which considers the societies as enabled to *lend*, and the corporation as obliged to *borrow* their funds, and in lieu of interest, to pay them such dividends as the stockholders receive, and to repay the principal at any time, on six months' notice. *This* confers a *favour* on the societies, and onerates the bank with such a *burden* as was deemed, by the legislature that granted, and the corporation that accepted the charter, a reasonable *bonus* for the monopoly simultaneously given.

2. That the giving of notice to the bank of an intention to withdraw, from that time converts the original investment into a legal debt. It then becomes money had and received for the use of the institution that invested it. Other creditors of the bank cannot complain ; for they dealt with it, knowing all the provisions of the charter.

3. That if the plaintiffs are creditors of the bank, and not stockholders merely, they are entitled to recover the *par* value of the shares, without reference to the condition of the bank This results from the *nature* of the claim. It is a right of tak-

ing back what had been put in.    Such too has been the practi-
cal construction.    This point will hardly be contested.

*Sherman* and *Hitchcock*, for the defendants, contended,
That the plaintiffs having subscribed for shares in the *Eagle
Bank*, pursuant to the charter, such shares constituted a part
of the capital stock, and the owners became members of the
corporation, and not its creditors.    At common law, they re-
marked, an association of men who are entitled to share the
profits of any business, are partners, and jointly liable to all the
creditors of the concern.    They may make such rules as they
please, in regard to the division of their common stock, as be-
tween each other ; but no one of them, by their mutual com-
pact, can be elevated to the rank or privileges of a creditor, but
all must contribute to the payment of debts.    Such, conse-
quently, would be the condition of all the proprietors of the
stock of this bank, associated on the very terms they now are,
were they unincorporated.    This rule of law is founded in nat-
ural justice: *Qui sentit commodum, sentire debet et onus.*  Nothing
could be more unjust, than that one individual of a joint concern
should enjoy the chance of gain, without sustaining the hazard
of loss ;—that he should receive the profits, and not contribute
to the losses of a common trade.

As all charters, containing provisions of doubtful construc-
tion, are to be interpreted according to the common law in
analogous cases ; the rule of interpretation must be adopted
here, if the terms of the charter are, in this respect, of equivo-
cal import.

That the *shares* taken by virtue of the provision in the 9th
section of the charter,(*b*) constitute a part of the *capital stock*
of the bank, is expressly declared in the 2d section, which
enacts, "that the *capital stock* shall *consist* of five thousand
shares of 100 dollars each, which shall be transferable, accord-
ing to such rules as shall be established by the directors ; *to-
gether with* such *shares* as have been or *shall be* subscribed
by the state of *Connecticut*, the school fund, any ecclesiastical
society, college," &c.    Thus, by the express language of the
statute, this class of subscribers *own shares* of the *capital stock*.

(*b*) Here, and throughout the argument of the counsel for the defendants,
the charter is referred to, as it appears in the statute-book, revision of 1821.

New-Haven,
July, 1829.

United Society
v.
Eagle Bank.

That they are *stockholders*, then, is not an inference, but a mere identical proposition. They compose a component part of the corporation.

This is settled by the first section of the act, which prescribes "that the *stockholders* of the *Eagle Bank*, their successors and assigns, shall be and remain a body politic," &c. It being thus unequivocally settled, by the charter, that those societies, &c. equally with other stockholders, are a component part of the corporation, we should reasonably expect some very explicit provision to exempt their stock from the common liability for debts due from the bank, if any such exemption were intended by the legislature. Without some provision to that effect, it will be admitted, that no such exemption can exist. But we find no such ; nor, so far as we can discern, any which will warrant the slightest implication of the kind. On the contrary, it is expressly enacted in the 6th section, " that bills or notes of the corporation, signed by the president, &c. shall be obligatory *on the corporation ;*" by which the body politic, as such, wholly and equally, without any distinction in favour of a class of stockholders, is subjected to the debts there specified.

But it has been said, that the right of societies to withdraw their " *shares*," on giving six months notice, is evidence of an *intent* in the legislature, that they should sustain no loss ; for they are clearly entitled to withdraw their *whole* shares. Had the provision been, that they might withdraw *all the money* paid in upon their subscriptions, it would admit of no doubt. But what is a " *share ?*" It is such a proportion of the *real capital* of the bank, as one hundred dollars bears to the whole *nominal* capital. The precision of this definition would not be denied, if the subscribers for the 500,000 dollars were the *only* stockholders. To say that the word *shares* has a different definition, when applied to the particular class of stockholders now in question, is to assume the point in controversy, unless some other part of the act is shown to warrant the distinction. This resort to other parts of the act, would admit, that *this* section does not contain evidence of an intent, which it has been adduced to prove. But this provision, taken by itself, and without the strong corroborations which other parts of the statute furnish, aptly limits and establishes the rights reserved to these societies, to withdraw their proportion of the *real capital* for the time being. If that has been augmented 10 *per*

*New-Haven*,
July, 1829.
_____
United Society
*v.*
Eagle Bank.

*cent.*, they will be entitled to withdraw 110 dollars for each share ;—if diminished 50 *per cent.*, 50 dollars only to a share can be reclaimed. The right of a stockholder to withdraw a " *share*" is, *ex vi termini*, a right to withdraw his *proportion* of the *real* capital, and nothing more or less. If the charter were revoked, all the stockholders might withdraw their "*shares*" of the *capital stock*, which, if one half were lost, would be equal to 50 dollars each. The privileged stockholders may do, at any time, precisely what the rest may do at the revocation of the charter.

But it has been said, that it would be difficult, if not impossible, to determine the amount of the shares of such corporations as might give notice to withdraw, as it would require an ascertainment of the state of the bank. The capital might in part consist of doubtful debts, or forfeited mortgages, or other property of uncertain value. But the statute assumes, that the state of the bank may be ascertained, and is, in fact, understood, by those who manage its concerns, at all times. This is evident from the provision in the 7th section, that " dividends of such parts of the *profits* as the directors may judge proper, shall be made semi-annually." By *profits* must be understood, the surplus of the property of the bank above its nominal capital. When the *real* capital is below the *nominal*, no dividend can be lawfully made ; and when the real capital exceeds the nominal, the amount of that excess must be ascertained, to determine *how much* may be divided. It is evident, therefore, that the legislature did not consider the difficulty of coming at this fact, as insurmountable.

In the common concerns of society, similar instances are of daily occurrence. In the distribution of estates, and innumerable other cases, the amount of shares paid in money, is ascertained, by the valuation of property and of credits ; and where no board is vested with the power of deciding the point, it must, if the parties cannot agree, be settled, as in other cases, by a court of justice. It is as practicable to decide how much must be paid, by the bank, to a stockholder withdrawing his share, by an estimate of all its funds, as to ascertain the semiannual amount of dividends ; for the *data* are the same in both cases. The directors are expressly bound, at the end of every half year, to possess all the knowledge of the state of the bank, for the object specified, which is requisite for this, and which would enable them, without further enquiry, to apart to any stock-

holder, the proportion in cash of the capital stock to which he is entitled.

It has been said, that the legislature intended to *favour* these societies; and hence it has been inferred, that they are not to be subjected to the responsibilities of stockholders. That the legislature intended to favour them, cannot be doubted; but to what extent can only be known by the terms of the charter. The bestowment of the common rights of stockholders would, of itself, be sufficient evidence of such an intent; for it is well known, with what eagerness *those* rights have been contended for, in applications for grants and in the distribution of stock. The obligations on banks to receive such subscriptions, has been considered as a sort of *bonus;* and the original stockholders have justly deemed it a great burthen on their charter, to be compelled to submit to the doubling of their capital, by such subscriptions. But from the general intent to favour these societies, we can no more conclude, that they were to be preferred to other stockholders, than that they were to be preferred to all other creditors. To infer a specific right, from a general intent to promote their interest, would be to make a conclusion so loose and indefinite, that it might be extended to supersede the rights of bill-holders and depositors, as well as those of other stockholders. The legislature intended to confer advantages on *all* the stockholders; but our knowledge of this intent will not save us the necessity of resorting to the charter to ascertain the nature and extent of those advantages.

It has been further said, that these societies, are denied the privilege of voting, which other stockholders possess. Were it so, it would be well for them to consider it duly before investing their money in the bank. But the conclusion would not follow, that they were to be creditors, and not stockholders. Suppose, as is the fact in some corporations, that a certain number of shares were necessary to entitle a stockholder to vote; we could not infer, that the proprietor of a less number, would be entitled to any preference in the division of the capital stock; much less, that he would have the rights of a creditor of the corporation. But, although no inference can be made from this consideration either way, we would remark, that it has never been decided, that these societies have not the right to vote. Such a right would not be inconsistent with their character as corporations; and if they were original stockholders, would not be questioned. It has already been

shown, that they are *stockholders ;* and no clause in the char- *New-Haven,*<br>July, 1829.
ter prohibits them.　On the contrary, it is expressly enacted in
in the 1st section, that " all stockholders shall be allowed to UnitedSociety<br>*v.*<br>Eagle Bank.
vote in general meeting, in person or by proxy, and one vote
shall be allowed for *each share.*"　If, in some respects, they
are in a worse condition than other stockholders, in others, they
are in a better.　If, on the one hand, to prevent the abuse of
their privilege of taking stock at all times *at par,* they are pro-
hibited selling it, in order to prevent unjust speculation—they
have the right, on the other, even when the value of stock is
*under par,* to withdraw their shares, and, if the bank is
sound, receive the nominal amount.　However great the cur-
rent dividends, or excessive the premium, they may take the
stock, *ad libitum,* till they have doubled the capital of the
bank, without paying any premium at all.　The mass of stock-
holders are not apprized of the declining state of a bank, until
it becomes a fact of general notoriety.　In that case, such is the
impression on the public mind, that the stock will generally fall
below its just value ; and it is better to withdraw than to sell.
While the original stockholders must either sell at a great sa-
crifice upon the real worth of their stock, or " patiently wit-
ness the destruction of their property," this privileged class of
subscribers, unless the decline be so rapid as to forbid all
hope, may attain better justice, by availing themselves of their
exclusive right to withdraw.　On justly counterbalancing the
advantages and disadvantages of this description of stockhold-
ers, the result will be greatly in their favour, and we shall not
be obliged to make them creditors, in order to shew that *some*
benefit was conferred, as well as intended.　From these con-
siderations, however, nothing is to be inferred relative to the
present question.　Each provision in the charter distinguishing
these societies from other stockholders, like that which pro-
hibits alienation, is founded on some obvious reasons peculiar
to their circumstances, and will afford no criterion by which to
ascertain the amount they are entitled to withdraw.　The ex-
press provisions which have made them *stockholders,* and *as
such* acthorized them to withdraw their *shares,* are the only
touchstone by which to test the nature and relative value of
their rights.

It has been said or intimated, that the charter of 1811 defines
the rights of subscribers differently from that of 1821, to which
we have hitherto alluded.　We will not reply to this objection

to the foregoing remarks, by saying, that if this difference does exist, the *last* act must be of paramount authority ; for no such difference in the charters can be discerned.    The rights of the favoured corporations are placed on the same ground in the original charter as in that of 1821.    This is evident from many of its provisions.    In the latter part of section 2. article 6., it is enacted, " that the debts of the corporation, whether by bill, bond, or note, shall not, at any time, exceed 50 *per cent.* over and above the total amount of its *capital stock* actually paid in, and of the moneys deposited in the bank for safe-keeping."    It will not be denied, that if the subscriptions of the state and of corporations should equal the residue of the bank, as by this charter they may, so that the whole would amount to one million, it would be lawful to contract debts to the amount of one million and a half ; and it will not be contended, that the sums paid on such subscriptions are " moneys deposited for safe-keeping."    In this clause, therefore, they are denominated " capital stock," and their owners are, consequently, *stockholders,* in the view of the legislature, or, in other words, members of the corporation, and subject, for the reasons before assigned, to all its liabilities.    In the original charter, the word "shares" is used in its appropriate sense, as well as in that of 1821, and signifies such a proportion of the real capital of the bank, for the time being, as 100 dollars bears to the whole nominal amount.    It has the same import in the *seventh* section, when applied to the interests of charitable and religious corporations, as in the *first* section, relating to the original stockholders.    The enactment in the *third* section, " that the *capital stock* shall consist of *five thousand shares,*" means, that it shall *at present* consist of that number *at least ;* and not that the twenty-five hundred authorized in the same section, or those mentioned in the *seventh,* are not equally to be deemed part of the *capital stock,* whenever they shall be subscribed.

If these privileged subscribers, instead of paying the debts of the bank, are permitted to come in as creditors, and increase their amount, the legislature are not only chargeable with having authorized a violation of the fundamental principles of the common law adopted in all analogous cases, but must have intended particular and gross injustice.    If their subscriptions had augmented the trading capital to a million, and the bank had lawfully contracted debts to the amount of fifteen hundred thousand ;—if its debtors had then failed to the amount of more

than a million, as in this case they actually have, these subscri-
creditors to sustain the loss of more than half a million, con-
tracted on the credit of this capital, and for the emolument of
those by whom it is withdrawn. They may first receive in-
terest on bills issued, and then withdraw the capital on which
they are issued, and which is pledged for their redemption.
This injustice is aggravated by the consideration, that the mere
bill-holder has no dealings with the bank. He is not like one
who contracts to build a banking-house, but he receives the
paper as he receives specie—as current money, of *intrinsic*
value. Having no contract with the bank, he is not presumed
to know its charter, which is not a public, but a private act.
He should be guarded from all the hazards assumed by every
contracting party, who reposes a *voluntary* confidence in the
solvency of his debtor. The public faith in establishing such
an institution is of peculiar sacredness. But upon the princi-
ple assumed by the plaintiffs, the legislature might as well au-
thorize the withdrawment of all the capital as a part, and leave
bill-holders, in all cases, to the mere courtesy of the corpora-
tion, without any legal power to enforce their demands.

But it has been insisted, that the first section of the original
charter of 1811, has, in terms, constituted those individuals a
body politic, who are proprietors of the *kind* of shares there
specified, *viz. transferable* shares ;—has made *them* "The
President, Directors and Company of the *Eagle Bank*," and
conferred on them, their successors and assigns only, all the
*corporate* powers specified in the act. Hence, it is inferred,
that they only are the stockholders of the corporation, or
proprietors of that portion of the capital of the bank, which is
liable for debts.

It is readily admitted, that all corporate powers are, by the
first section, conferred on the proprietors of transferable stock
alone. It must, indeed, be farther admitted, that when the
first 5000 shares are distributed, by the commissioners, among
subscribers, those subscribers *alone* become vested with *all* the
powers of the corporation. But it is denied, that this leads to
the conclusion, that proprietors of other shares, admitted pur-
suant to subsequent provisions in the charter, will not, when
those provisions are complied with, become members of the
same corporation and stockholders therein. Because the sub-
scribers for the first 5000 shares are invested with *all* corpo-

rate powers, and their stock liable to every demand upon the bank, before any other stock is added, does it follow, that the proprietors of the 2500 transferable shares, mentioned in the third section, will not, when the powers given in that section are executed, become stockholders too, and partake, equally with the first, of the powers and liabilities of the body politic? Such a consequence will not be contended for, by the plaintiffs. No difference, however, is perceived, between the new stockholders to be admitted by the third section, and those entitled by the seventh. Because the former may cease to be stockholders, by the *transfer*, and the latter, by the *withdrawment* of their shares, it would not seem to follow, that the latter were not stockholders, while they held their stock, nor members of the corporation before they withdrew.

Reference has been had to the charters of the other banks in this state; and it has been insisted, as all bank charters are parts of the banking system, and the provisions made in all for religious and charitable corporations are parts of the same system of legislative beneficence towards those institutions, that these acts are in *pari materia*; and that the language in all is to be considered in ascertaining the intent of each, as if they were but one act. To this it may be replied, first, that they are not public, but private acts, establishing distinct private corporations, and, therefore, do not admit this principle of interpretation, any more than a contract between *A.* and *B.*, may be interpreted by another contract, made at another time, between *A.* and *C.* But, secondly, if we resort to the other charters, we shall find, that these societies take *shares* in them as well as in this, and are *stockholders* in them all. The expression in some of the charters, that they may withdraw "their money," implies no more than we admit, and does not define *how much* their money is. That is left to be ascertained by the state of the bank. Should a charter expire or be revoked, every stockholder might withdraw "his money;" but if the trade of the bank had been unfortunate, its amount would be proportionally reduced.

HOSMER, Ch. J. The contestation of the parties is merely this. The plaintiffs contend, that they, by virtue of their subscription, became neither stockholders in the *Eagle Bank*, nor a part of the body politic or corporation; but on their giving notice of their intention to withdraw their shares, their original

investment, from that time at least, was converted into a legal debt. On the other hand, the defendants insist, that the plaintiffs, by their subscription, became stockholders, and a part of the body politic or corporation ; and of consequence, the bank being utterly insolvent, they were incapable of withdrawing their shares.

The solution of the controversy depends on a construction of the defendants' charter. Between that, however, and the act of *May* session 1821, there is no essential difference; the latter varying the method only, and explicitly declaring what the former clearly implied.

We will first bring into view the material clauses of the charter, and then attend to their construction. [Here the Chief Justice referred to the 1st section, the 2nd and 6th articles of the 2d section, and the 3rd, 6th, 7th, and 8th sections.]

The charter being thus brought before us, we will now proceed to an exposition of it. In doing this, we shall not forget, that a statute ought to be expounded according to its intent ; (*Com. Dig. tit.* Parliament. R. 10. b.) at the same time remembering, what is often forgotten, that in many, perhaps in most cases, the plain meaning of the language used, is the best evidence of intention. *Curtis* v. *Hurlburt*, 2 *Conn. Rep.* 309.

For the purpose of simplifying the case, we will put out of consideration certain principles insisted on, as they reflect no light on the construction of the charter.

The plaintiffs have recurred to the charters of several banks, in which subscribers are permitted to withdraw " their subscriptions" and " their moneys," after six months' notice. These expressions are supposed to denote the same right, which the plaintiffs claim, by the words " to withdraw their shares," and to give a construction to them, on the ground that the laws are *in pari materia.* I am of opinion that the acts referred to are not in *pari materia ;* but that they are distinct and irrelevant to each other. Statutes are *in pari materia,* which relate to the same person or thing, or to the same class of persons or things. The word *par* must not be confounded with the term *similis.* It is used in opposition to it, as in the expression "*magis pares sunt quam similes ;*" intimating not likeness merely, but identity. It is a phrase applicable to public statutes or general laws, made at different times, and in reference to the same subject. Thus, the *English* laws concerning paupers and their bankrupt acts, are construed together, as if they

were one statute, and as forming a united system ; otherwise the system might, and probably would be unharmonious and inconsistent. Such laws are *in pari materia*. But private acts of the legislature, conferring distinct rights on different individuals, which never can be considered as being one statute, or the parts of a general system, are not to be interpreted, by a mutual reference to each other. As well might a contract between two persons be construed by the terms of another contract between different persons. The obligation of a contract cannot be impaired, by this indirect proceeding.

If, however, the acts were *in pari materia*, it would not avail the plaintiffs. When it is provided, that subscriptions or moneys may be withdrawn, the meaning is the same as that there may be a withdrawal of shares ; for the latter can only be withdrawn by money, which is the common standard of value.

It was insisted, by the plaintiffs, that by a practical construction of the banks, shares have usually been withdrawn at their *par* value. While sitting in this court, we have not the means of ascertaining the fact advanced, concerning which the motion is silent. But admitting it, for the sake of argument, I do not deem it of much importance. If the charter of the defendants is clear and unambiguous, it must be construed by its provisions. A mistaken practical construction cannot destroy the unquestionable rights of the parties. In *Cooke* v. *Booth,* *Cowp.* 819. the contrary was decided ; but this determination has frequently been disapproved of, and a different rule is now established. *Baynham* v. *Guy's Hospital,* 3 *Ves.* jun. 298. *Eaton* v. *Lyon,* 3 *Ves.* jun. 694. *Iggulden* v. *May,* 9 *Ves.* jun. 333. "It cannot be a legal rule of construction," said the master of the rolls, "that the party who has done an act, which he was not bound to do, or from mistake, should therefore be bound forever, without the power of retracting." *Moore* v. *Foley,* 6 *Ves.* jun. 238. These considerations I put out of the case, as possessing no essential importance.

1. In the first place, I am of opinion, that the plaintiffs, by their subscription, became *stockholders*.

Each hundred dollars subscribed, by the express provision of the charter, entitled them to *a share* in the *Eagle Bank*. What is intended by the word *share?* In its popular and familiar meaning, it denotes a part or portion of a thing owned in common. By the 1st section of the charter, it is provided, that

*New-Haven*,
July, 1829.

UnitedSociety
*v.*
Eagle Bank.

" the capital stock shall be divided into shares ;" and by the 3rd section, that " the capital stock of said bank shall consist of five thousand shares." These expressions are precisely synonymous with the assertion, that each share shall be a part of the capital stock. It is impossible, that language should be more definite and unequivocal. The word *share* having thus been defined, it is invariably used with the same meaning throughout the charter. Thus, it is said, that " one vote shall be allowed for every *share* ;" that " for two thousand five hundred [additional] *shares*" a new subscription may be opened ; and that the state and ecclesiastical societies may subscribe "*for shares*." Shares of what ? Undoubtedly, shares of the *capital stock*. This correlative of the word *shares*, had been expressly declared in the charter ; and after this, a certain subject of reference having been given, it became unnecessary to repeat it. When, therefore, it was provided, that the state and ecclesiastical societies might subscribe for *shares*, it was equivalent to the assertion, *shares of the capital stock*. It is impossible to doubt it. In a statute or formal instrument, the same words regarding the same subject matter, must be taken to import the same signification. This is a self-evident principle, without the admission of which there is no rule to find out the true and genuine sense of language. By the *stock* of a company is intended its fund or capital. He who owns a share of the stock or capital, is a share-holder or stock-holder, words of equivalent meaning, unless all the stock is owned by a single person.

The meaning of the term under discussion, would scarcely have been questioned, were it not for the proviso to the section, under which the plaintiffs made their subscription. The proviso, however, so far from countenancing a different meaning of the word *shares*, affirms that which I have adopted. It declares, that the shares " shall not be transferable." If the plaintiffs' shares could not become a part of the capital stock, why this provision ? It would have been entirely superfluous. A right to a sum of money is a chose in action, and incapable of transfer. It was because the shares were to be part of the capital, and, if unrestrained, transferable stock, that the provision was made.

In opposition to the meaning of a familiar word, whose signification is likewise defined, by the plain provisions of the charter, the plaintiffs have founded themselves on a supposed

object of the legislature in authorizing their subscription. It was intended, they assert, to confer on them a privilege ; but that, on the defendants' construction, they are placed in a worse condition than any other persons interested in the bank. The privilege, they add, was by rendering them creditors, and not stockholders ; in this manner preserving them from responsibility and loss.

It is admitted, by the parties, that a privilege was intended the plaintiffs. It devolves, then, on the plaintiffs, to show, that on the defendants' construction, they had no privilege, but the reverse of one ; and that the intended boon was to render them creditors, and not stockholders.

That their subscription, if they became stockholders, was not a privilege, is supposed to result from their incapacity to transfer their stock, and their subjection to the debts and responsibilities of the bank. On this part of the case, the ground taken in argument was too narrow. All the advantages and disadvantages of the plaintiffs' condition should be recurred to, and then, on comparison made with the other stockholders, their relative situation will be discerned.

In the first place, without asking the consent of any one, they had a legal right to subscribe for shares at their pleasure, on the advancement of one hundred dollars for each share. Thus far, their privilege was peculiarly great. They might become interested in any bank within the state, and, at par value, take the benefit of its prosperous condition. To prevent pernicious stock-jobbing, they were not permitted to transfer their shares. This disadvantage was countervailed, in some measure, by allowing them to withdraw them, on six months' notice. This, it is believed, is not as valuable as the unrestrained right of transfer. At the same time, it did not greatly impair the value of the plaintiffs' privilege. If, as a general truth, the insolvency of our banks is a rare occurrence, and from the apparent signs of danger to the solvency of those institutions, a prudent and discerning man may look ahead a few months, and render himself secure ; both of which suppositions are believed to be true ; there is little abatement to be made from the before-mentioned privilege, by reason of the non-transferability of shares. On the other hand, those who become stockholders, by purchase, must wait for an opportunity of investing their money, and when it arrives, must pay the price above par, which stock bears in the market. I en-

tertain no doubt, that the right of transfer, when they become <span style="float:right">*New-Haven,* July, 1829.</span> purchasers, does not place them, in point of privilege, on a level with those who can always buy at par, and force themselves on the most prosperous banks; and, as soon as they please, on the delay of six months, can retire with their share of the capital.

*United Society v. Eagle Bank.*

The plaintiffs asserted in the argument, that not only a privilege was intended, but that no loss should happen to them, except that which attends ordinary depositors. The assertion was made; but how was it supported? To me it appears to have been wholly gratuitous. The words of the charter give no intimation of such intent; nor has any ground been referred to, from which it can be implied.

It has been asserted, that the plaintiffs had not the right of voting in the corporate meetings, and that this was a diminution of a general and important privilege. For this remark, I discern no just foundation. If the plaintiffs were stockholders, they were voters, by the express provision of the charter.

A more serious objection has been made. It has been insisted, that the defendants' construction is impracticable; that it renders necessary the winding up of the concerns of the bank, on every notice to withdraw a share. The remark is founded on the principle, that the value of a share can in no other manner be ascertained.

That the legislature viewed the subject in a different light, is unquestionable. They have provided, that such part of the profits of the bank as the directors may judge proper, shall be divided semiannually. By *profits* is intended the acquisitions of the bank beyond the nominal capital. The condition of the bank must be ascertained, or how can the profits be known? But the means of ascertainment, for this ordinary six months' operation, are precisely those, and no other, that the directors have, in determining the value of a share. On the point in question, a defect has arisen in the omission to distinguish between a mathematical and a moral certainty. The semiannual profits to the stockholders, as a general truth, cannot be ascertained with mathematical precision; nor is it expected. But the means of moral certainty are possessed; the principle by which most of the concerns in human life, are regulated; and the value of a share may be estimated as nearly as other probabilities are, on which men act with a conciousness of safety.

On the whole, I entertain no doubt that the plaintiffs are stockholders, and onerated with the responsibilities of such ; nor can I consider them as creditors, unless by the indulgence of a latitude of construction, which more resembles legislation than judicial decision.

The shares of the plaintiffs may be withdrawn, if they exist. But the capital of the corporation is bound to creditors, and if the debts against it surmount the capital, there are virtually no shares.    The capital has perished, and the shares with it.

On the clearest principles of natural justice, the case demands this construction.    It is in analogy with the maxim of the common law—*Qui sentit commodum, sentire debet et onus.* To the favoured stockholders no injustice is done, who, in the day of the bank's prosperity, received profits, perhaps great profits, on their investments.    On the other hand, the justice due to the creditors of the bank, imperiously requires it.    They trusted the capital of the bank ; that capital, which the plaintiffs with others put forward as an inducement to the trust. That the plaintiffs, under such circumstances, should be permitted to withdraw the value of their shares, and thus deepen the loss of the creditors, is too inequitable to justify the belief, that such could have been the legislative intent.

2. I come now to the question, whether the plaintiffs were part of the corporation or body politic, and subject to its debts.

They were stockholders ; and, by a clear consequence, it would seem to follow, that they were a part of the corporation.    An incorporation, generally speaking, is instituted for, and comprises, those who are owners of the capital, for the benefit of which the body politic was created.    It is said, by the plaintiffs, that the legislature has limited the incorporation to the five thousand shares of transferable stock, with which the bank was to commence its operations.    On this subject, I do not question the legal omnipotence of the legislature ; but it may be reasonably demanded, that the supposed limitation, so much at war, as it is, with all observation and experience, should be clearly established.    The charter, in its 1st section, provides, that " the capital stock shall be divided into shares of one hundred dollars each, which shall be transferable, &c. and the subscribers to the same &c. shall be and are hereby constituted a body politic and corporate ;" and by the 3rd section, the capital stock is to consist of five thousand shares.    By the *letter* of the act, thus far, the corporation appears to be limited

to this original transferable stock ; but in my opinion, it is much *New-Haven,*
July, 1829. too narrow an exposition of the charter.    The spirit and intent of the law, taking into view all its provisions, is widely United Society
*v.*
Eagle Bank. different.    It was undoubtedly intended, at all times, to cover the whole capital.    The reason of the case shows it.    At its commencement, the bank was made to consist of a capital of five thousand transferable shares ; and referring to these, the corporation expressly covered them.    But it was on the common principle, that the subscribers to the capital, and stockholders, should constitute the persons incorporated.    By a subsequent provision of the law, twenty-five hundred transferable shares might be added.    Was it the intent of the charter, that the owners of these shares should be excluded from the incorporation ?    1 cannot believe it.    They are within the same reason as the first subscribers ; and they equally need the advantage of being a part of the body politic, and aiding in the superintendence of their own property.    The state is, likewise, authorized, in a certain event, to appoint directors ; but are they thus to manage the concerns of the bank, while they are no part of the corporation ?    The construction for which the plaintiffs contend, in my opinion, is obnoxious to the implied censure of the maxim, *Qui hæret in litera, hæret in cortice.*

But even the letter of the charter, when the whole of it is surveyed, has been misapprehended ; for by the 2nd article of the 2nd section, the point in question is settled.    " All stockholders shall be entitled to vote ;" that is, every stockholder is a member of the corporation, and *may exercise this act of a corporator.*

To obviate this, it was said, that no transfer shall be allowed of any share, until the expiration of six months from the time of subscription, and therefore, that the power of voting was limited to transferable stock.    By no means.    We discern no relation between the premises and the inference.    Besides, a suspension of the right of transfer, or a prohibition of it, or even a suspension of the right of voting, for a limited period, are not incompatible with a right of membership in a corporation.    On the contrary, they presuppose it.

In conclusion, I entertain no doubt, that by their subscription, the plaintiffs became stockholders in the *Eagle Bank,* and a part of the body politic or corporation.    Of consequence, I am of opinion, that judgment must be rendered for the defendants.

*United Society*
*v.*
Eagle Bank.

BISSELL, J. was of the same opinion.

PETERS, J. being interested in the event of the suit, and DAGGETT and WILLIAMS, Js., having been of counsel in the cause, gave no opinion.

Judgment to be for defendants. (*a*)

(*a*) By an act of the General Assembly, passed *May* session, 1829, it was provided, " That in all suits in law or chancery, depending in the Supreme Court of Errors in this state, where any three of the Judges of said Court are, or shall be, by reason of interest or otherwise, legally disqualified from acting or sitting in judgment, the other two Judges of said Court shall constitute a quorum, and shall be empowered to hear and determine said suits, and render judgment therein."