President, &c. of Waterford and Whitehall Turnpike *v.* The People.

Same Term. *Cady, Paige, Willard, and Hand,* Justices.

The President, Directors and Company of the Waterford and Whitehall Turnpike *vs.* The People.

The act of April 27, 1847, to provide for additional challenges to jurors, and the provisions of the revised statutes respecting challenges to jurors, are in *pari materia,* and must be construed as if they formed parts of the same statute and were enacted at the same time.

By force of the statutes, thus construed, the public prosecutor, on the trial of an indictment, is entitled to the same number of peremptory challenges that are allowed to parties in civil actions. Cady, J. *dissented.*

What is meant by statutes being in *pari materia?*

It is a general rule that when an English statute has been re-enacted in this state, it is to be understood as it has been interpreted by the courts of that country, unless there is something in the act which adopts it, indicating a different intention.

A turnpike road company is liable to an indictment, at common law, for a nuisance in suffering its road to be out of repair, notwithstanding that by the terms of its charter a specific penalty is provided for the neglect of the company to keep its road in repair, and the act is silent in respect to an indictment; if the charter contains no *negative words,* nor any expression indicating an intention to impair the common law remedy.

Upon the trial of such an indictment, proof by the defendants that they had no funds with which to repair the road, will not be a valid defence.

It is a general principle that those who are bound to repair a road may be indicted, at common law, for suffering it to fall into decay.

To render a turnpike road a *nuisance*, it is not essential that it should be unsafe, or impassable. Any contracting or narrowing of a highway is a nuisance. So, as to any obstruction left in the road, or omission to repair it, whereby it is less convenient for public use.

The public has a right to have a turnpike road continued substantially in the same manner, as to width and safety, which its charter required at its first construction.

THIS was a writ of error to the court of oyer and terminer for the county of Saratoga. From the return to the writ, it appeared that the plaintiffs in error were indicted, at the Saratoga sessions in January, 1848, for a nuisance in not keeping their road in necessary repair. The indictment was removed into the court of oyer and terminer, and was tried in that court, on not guilty pleaded, before WILLARD, J. in February, 1849, when the defendants were found guilty, and sentenced to pay a fine of $100. A bill of exceptions was taken to sundry rulings of the court, and was returned to the writ of error, together with the indictment.

The indictment contained several counts. The first count recited the act of the 26th of March, 1806, incorporating the defendants below, the building of the road in pursuance thereof, their erection of gates and taking of toll, and their obligation to keep it in repair, and alledged that on the 1st day of March, 1847, and from thence until the finding of the indictment, that part of the said turnpike road being in the county of Saratoga, in length about 27 miles, from the village of Waterford to Fort Miller bridge, " was and hath been ever since and still is very ruinous, miry, deep, broken and in great decay ; that the same was narrow and contracted, that the bridges and the coverings thereof were ruinous, decayed and broken down for the want of due and necessary amendment and reparation of the same, so that divers good and worthy citizens in and along the same turnpike road with their horses, coaches, carts and carriages could not during the time aforesaid nor yet can go, return, pass and repass, ride and labor without great danger of their lives and the loss

of their goods, to the great damage and common nuisance of all the good people," &c. &c.

The second count complained of that part of the said turnpike situate in the town of Halfmoon, near the house of Robert Powers, about forty rods in length, and charged that on the 14th June, 1847, and from that day till the finding of the indictment, "that part of said road was and has been and is very hollow in the centre, miry, deep, and broken for want of reparation and amendment, and for the want of gravel and earth in the centre of said road, and for want of proper ditches along the side of said road so as to form an arch from the sides to the centre of the same, so that the good people, &c. could not go, return, pass, repass, ride and labor with their horses, coaches, carts and other carriages in, through and along said road, as they ought and were wont and accustomed to do, *without great delay, hindrance and annoyance,* to the great damage and common nuisance," &c.

The third count specified about forty rods of the road in the same town, at the Mills place, "which during the same period was suffered to be and remain very rutty, miry, rough and uneven, and the surface of the said road was and is very narrow and not of the width of twenty-eight feet, for the want of proper bedding and reparation of the same, and for the want of sufficient stone, earth, gravel or other hard substance, so that the people could not go, pass, &c. with their carts, &c. as they were entitled to, *without great danger to their lives and the loss of their goods,* &c. to the common nuisance," &c.

The fourth count related to a part of the road in Stillwater, which was stated to be rough, narrow and uneven for the want of proper grading and excavation of the rocks and ledges, and also complained of the parts crossing the Champlain Canal at Bemus' Heights, which was said to be hollow in the centre, rutty, muddy and uneven ; and also the part at Wilbur's Basin, which was described as *slanting, sidling, pitching,* narrow and uneven, rutty, miry and sliding, for the want of proper grading, filling and repairing. "And also the part of said road north of Wilbur's Basin, on the west bank of the Hudson River, for the

distance of eighty rods, which was narrow and not of the width of four rods, and the bed of the road not of the width of 28 feet, and which was built and is yet on a perpendicular bank, without any guards or railing, so that people could not travel with teams, &c. without great danger of their lives and the loss of their horses, carriages, coaches," &c.

The fifth and sixth counts described other parts of the road and the particulars with respect to which it was insisted that the defendants were guilty of a nuisance.

In impannelling the jury for the trial of the cause, the name of Henry Doolittle was drawn as a juror; whereupon the district attorney, in behalf of the people, peremptorily challenged the said juror, claiming that he had a right so to do by the provisions of the revised statutes and the act of 1847. This was objected to by the defendant's counsel, but allowed by the court, and the defendant's counsel excepted to the said decision. The district attorney then read the act of incorporation of the defendants, which was objected to as immaterial by the defendant's counsel. The objection was overruled by the court; and the defendant's counsel again excepted. The district attorney then proved by an officer of the company, that the road in question was constructed by the defendants under their act of incorporation, in 1806 and 1807, that gates were erected to collect tolls and had been kept up ever since, and that toll was collected in 1847. The defendant's counsel then offered to prove by cross-examining this witness, that the stockholders had paid in all their stock, and that the same was expended in building the road, and that since then all the moneys collected for tolls had been laid out and expended in repairing the road, and that during the year 1847, and when this indictment was found, the defendants had no funds with which to repair the road. This evidence was objected to and excluded by the court, and the defendant's counsel again excepted. The district attorney offered evidence to prove that the road was out of repair on the 1st day of June, 1847, and had continued so up to the time of finding the indictment. The defendant's counsel objected that such evidence was immaterial unless the district attorney would

prove that the road was a nuisance on the day when the indictment was found. The court received the evidence, and the defendant's counsel again excepted.

The public prosecutor proposed to prove, under his first count, that the whole road, lying in the county of Saratoga, was out of repair, and a nuisance. This count was objected to as too general. The defendant's counsel insisted that none but the specific parts of the road objected to in the other counts could be proved, but the court held otherwise, and received the evidence, and the defendant's counsel again excepted. The public prosecutor gave evidence tending to support the indictment, and proposed to show that the road was hollow and not arched. The defendant's counsel objected to this evidence, but the court overruled the objection and received the evidence, and the defendant's counsel again excepted. The defendant's counsel offered to prove that when the state built the Champlain Canal they took a part of the turnpike and removed the road and carried it over the canal, and that the road had remained ever since substantially as made by the state, and that the steep banks between the road and canal was occasioned by the excavation made by the state in making the canal. This evidence was objected to and excluded by the court, and the defendant's counsel again excepted.

Evidence was given by both parties as to the actual condition of the road during the period embraced in the indictment. The defendant's counsel requested the court to charge the jury that if they found that the road was safe and passable the defendants were not liable to this indictment, notwithstanding they should find that the road was not continued substantially according to the terms of the act of incorporation. The court refused so to charge, and the defendant's counsel excepted. The jury found the defendants guilty.

*E. F. Bullard*, for defendants.

*J. Lawrence*, (district attorney,) for the people.

*By the Court*, WILLARD, J.   The first exception arises on the decision of the court in allowing to the public prosecutor a peremptory challenge to one of the jurors.   The challenge was claimed by the district attorney under 2 *R. S.* 734, § 11, in connection with the first section of the act of 1847.   (*Laws of* 1847, *p.* 130.)   To determine whether the court of oyer and terminer gave a correct construction to the above mentioned statutes, it will be necessary to examine how this question stood at common law.

· It is laid down in all the elementary treatises, that prior to the 33d Edw. 1, stat. 4, commonly called *ordinatio inquisitionibus*, or an ordinance for inquests, any number of jurors might have been challenged on the part of the crown, without alledging any other objection than "*quod non boni sunt pro rege.*"   But this was found, says Coke, to be mischievous to the subject, tending to infinite delays and danger.   It was therefore enacted by the last mentioned statute, (33 Ed. 1, st. 4, A. D. 1305,) *quòd de cætero licèt pro domino rege dicatur quòd juratores, &c. non sunt boni pro rege; non propter hoc remanent inquisitiones, &c. sed assignent certam causam calumniæ suæ, &c.*   (4 *Bl. Com.* 353.   *Co. Lyt.* 156, *b.*   1 *Chit. Cr. L.* 533.   2 *Hale's P. C.* 271.   *Sir T. Raym. R.* 473, 474.)   Under this statute it was held that the king was not bound to assign his causes of challenge till all the panel was gone through.   And then and not before the king's counsel must show the cause.   (4 *Bl. Com.* 353.   *Hargrave, Butler's Note,* 282 to *Co. Lyt. supra.*)   It is observable that the jury act, 6 Geo. 4 ch. 50, § 29, passed in 1825, contains the same provision as the 33 Ed. 1, thus; "howsoever it be, notwithstanding it be alledged by them that sue for the king, that the jurors of those inquests, or some of them, be not indifferent for the king, yet such inquest shall not remain untaken for that cause; but if they that sue for the king will challenge any of those jurors, they shall assign of their challenge a cause certain, and the truth of the challenge shall be inquired of," &c.   (*See App. to* 3 *Chit. Cr. L.* 11.)

The common law of England as modified by the statute of 33 Ed. 1, was the law of this state at the time of the revolution.

At common law a prisoner accused of treason or felony, could peremptorily challenge thirty-five jurors; and the king, before the statute of 33 Ed. 1, an unlimited number ; but after this statute his right of peremptory challenge was limited to the full panel of thirty-six. Beyond those numbers, the challenge of either party rested upon cause shown. At the revolution the people succeeded to the rights and prerogatives of the crown, and the law continued the same as under the colony, except as it was altered by the constitution or the laws of the state. The first act, after the revolution, for regulating trials of issues, and for returning able and sufficient jurors, was passed on the 19th April, 1786. (1 *Greenl. Laws*, 261.) The 22d section is copied with but slight alteration, from the statute 33 Ed. 1, st. 4. It is in these words :

" § 22. And be it further enacted by the authority aforesaid, that in all cases where the attorney general of this state, in behalf of this state, or he who shall in any case prosecute for the people of this state, shall challenge any juror as not indifferent, or for any other cause, he who shall make any such challenge, shall immediately assign and show the cause of such challenge, and the truth thereof shall be inquired of and tried, in the same manner as the challenges of other parties are or ought to be inquired of and tried." And the 35th section of the constitution of 1777, adopted as the law of this state such parts of the common law of England, and of the statute law of England and Great Britain, and of the acts of the legistature of the colony of New-York, as together did form the law of the said colony, on the 19th April, 1775, with certain exceptions and limitations not affecting this question. It is a general rule that when an English statute has been re-enacted in this state, it is to be understood as it has been interpreted by the courts of that country, unless there is something in the act which adopts it, indicating a different intention. This is particularly so with respect to those old statutes, which at an early day received a judicial construction and formed a part of the law of England at the time of the settlement of this country. The statute of 1786 is entirely silent as to whether the public

prosecutor was entitled to a peremptory challenge, or not. It left that matter as it found it.

At the revision of the statutes by Kent and Radcliff, in 1801, the 22d section of the act of 1786, *supra*, is adopted literally as the 25th section of the statute, thus revised, with this proviso. "Provided, that nothing in this act contained shall be construed to take away the right of peremptory challenge, in any cases, where the same are now allowed by law." The only effect of this proviso was to indicate more clearly the intention of the legislature, not to take away, by this act, the common law prerogative of the crown with respect to peremptory challenges, which had become vested in the people by the revolution. There are no peremptory challenges to which it can relate, except those which appertained to the crown, and which were limited by the act of 33 Ed. 1, st. 4. The legislature had already, by the act of 20th March, 1801, (*K. & R.* 215,) allowed the party indicted for treason, a peremptory challenge of thirty-five jurors; and to the party indicted for any other crime punishable with death or with imprisonment for life, a right peremptorily to challenge twenty jurors.

At the revision of the laws in 1813 the said 25th section was re-enacted, with the proviso, without alteration, (1 *R. L.* 334,) and continued in force until the revision in 1830. In the revised statutes the phraseology was slightly changed, in this form. (2 *R. S.* 734, § 11.) "The attorney general, or district attorney prosecuting for the people of this state, shall be entitled to the same challenges in behalf of this state, either to the array or to individual jurors, as are allowed to parties in civil cases; and the same proceedings shall be had thereon as in civil actions." The first section of the act of April 27, 1847, entitled an act to provide for additional challenges to jurors, (*Laws of* 1847, *p.* 130,) is as follows. "Upon the trials of any issue or issues of fact, joined in a civil action, each party shall be entitled peremptorily to challenge two of the persons drawn as jurors for such trials." The second section gives to a person arraigned and put on trial for any offence not punishable with death, or with imprisonment in a state prison ten years or a longer time,

a right peremptorily to challenge five of the persons drawn as jurors for such trial, and no more ; except that on trials in a court of special sessions the right is limited to two.   The 3d section is thus :   " Nothing in this act contained shall be deemed to prevent any challenges heretofore allowed, either to the array of jurors, or to individual jurors."   This saving clause is in its effect  much like the proviso in the act of 1801 and 1813, and was doubtless inserted for greater caution.   Whether it is sufficient to preserve the common law right of the crown peremptorily to challenge every juror until the panel is called through, it is needless now to inquire.   The right claimed by the people in this case does not make such examination necessary.

The act of 1787 and the revised statutes so far as they relate to challenges to jurors, are *in pari materia*, and must be construed as if they formed parts of the same statute and were enacted at the same time.   (*Smith's Com. p.* 751, *et-seq. ;* § 736, *et seq.*)   What is meant hy statutes being *in pari materia* was well expressed by Ch. J. Hosmer in *The United Society* v. *The Eagle Bank*, (7 *Conn. Rep.* 469.)   Statutes are *in pari materia*, he observes, which relate to the same person or thing, or to the same class of persons or things.   The word *par* must not be confounded with *similes*.   It is used in opposition to it, as in the expression "*magis pares sunt quam similes ;*" intimating not likeness merely, but identity.   It is a phrase applicable to public statutes or general laws, made at different times and in reference to the same subject.   Thus the English laws concerning paupers, and their bankrupt acts, are construed together, as if they were one statute, and as forming a united system ; otherwise the system might and probably would be unharmonious and inconsistent.   Such laws are *in pari materia.*"   Several acts *in pari materia* are to be taken together, and compared in the construction of them, because they are considered as having one object in view, and as acting upon one system.   (1 *Kent,* 463.)   "All acts *in pari materia*," says Lord Mansfield in 1 *Douglass,* 30 " are to be taken together, as if they were one law."   "This rule applies," says Chancellor Kent, " though some of the statutes may have expired, or are not referred to in

VOL. IX.                    22

the other acts.   The object of the rule is to ascertain and carry into effect the intention ; and it is to be inferred, that a code of statutes relating to one subject, was 'governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions.  (1 *Kent's Com.* 463, 464.  *Smith's Com.* § 639.)

If, then, the provisions of the act of 1847 were incorporated into the revised statutes, and the whole were examined as forming one entire system, there would be no room to doubt that the public prosecutor, on the trial of an indictment would be entitled, by force of the statute, to the same number of peremptory challenges, that are allowed to parties in civil actions.   As soon as one section informs us of the number of peremptory challenges allotted to parties in civil actions, it is at once known what number belong to the public prosecutor, in behalf of the people. The language of the statute is clear, definite and unambiguous. In such cases the statute calls for no interpretation.   It is its own best expositor.  (*Smith's Com.* § 501.)   "It is not allowable," says Vattel, b. 2, ch. 17, § 263, " to interpret what has no need of interpretation.   When the words of an act are in clear and precise terms—when its meaning is evident, and leads to no absurd conclusions, there can be no reason for refusing to admit the meaning which the words naturally present ; to go elsewhere in search of conjecture in order to restrict or extend the act, would be but an attempt to elude it.   Such a measure, if once admitted, would be exceedingly dangerous, for there would be no law, however definite and precise in its language, which might not by interpretation be made useless."

It is not to be presumed that the legislature of 1847 were ignorant of the revised statutes, nor that they did not foresee the bearing which the first section of the act in question would have upon the rights of the people on the subject of challenges.  They could not fail to see that it gave to the public prosecutor in direct terms, the same peremptory challenge that was allowed to parties in civil actions.   They saw that it might be so construed as to take away the peremptory challenge, which was claimed by the people as succeeding to the royal prerogative,

and restrict it to the same number which was granted to parties in civil actions. To obviate that construction the saving clause in the third section was probably inserted. It is not necessary to decide whether that saving clause is or is not repugnant to the act. That question can not be raised until the public prosecutor claims to exercise the right of challenging, without cause, any number above two.

The construction given to the act makes the entire system harmonious in all its parts. It gives to the public prosecutor no advantage over defendants; because their right of exclusion, by reason of peremptory challenge is still greater than his. It gives no new and unheard of privilege to the officer prosecuting for the public. It merely defines a privilege which at common law had existed without stint, and which, since the early part of the fourteenth century, had extended to the entire panel of jurors. It is therefore restrictive rather than enlarging the power of challenge, on the part of the people.

It is quite clear that many of the exceptions, taken at the trial, were frivolous; and, indeed, several of them were abandoned on the argument. They were finally narrowed down to the questions, whether an indictment was a proper remedy; and whether a want of funds to repair the road was any excuse to the defendants; and whether the court erred in refusing to charge as requested.

The act incorporating the defendants was passed on the 28th of March, 1806. (4 *Webster*, 423, 29th *Sess. ch.* 87.) By the 5th section it was enacted, that the road should be at least four rods wide, and that it should be made by bedding the breadth of twenty-eight feet with stone or gravel, of a depth sufficient to secure a firm and solid foundation, and to be paved with gravel, pounded stone, slate, or other hard substance, so as to secure as near as the materials would admit of, a firm, smooth and even surface, rising by a gradual arch from the sides to the centre of the same. The 17th section directed that the road should be divided into three inspection districts, for each of which a commissioner was to be appointed by the governor. Whenever complaint is made to the commissioner that the road within his

inspection district is out of repair, it is made his duty to examine the same, and if upon such examination he shall find the same to be out of repair, he shall by writing under his hand, give notice to certain officers of the company, therein mentioned, of such defects; and the defendants are required immediately thereupon to cause the said defects to be repaired, under the penalty of ten dollars for every neglect of forty-eight hours to repair such road; provided that if the company cause the gate nearest to that part of the road which is out of repair to be opened and kept open, until the said road, in the judgment of the said commissioner, shall have been sufficiently repaired, then, and in such case, the said penalty shall not be incurred," &c. It has been urged, that, because here is a specific remedy given, and the act is silent as to an indictment, therefore an indictment will not lie in this case.

There is no force in this objection. The remedy here given is cumulative. It is summary in its nature; and while the road was profitable to the stockholders, it afforded the public an adequate guarantee against a defective road, without the delay and expense of an indictment. It was never intended, however, as a substitute for the common law remedies for a nuisance. It is a general principle that those who are bound to repair a road may be indicted at common law for suffering it to fall into decay. The precise question arose in *The President and Directors of the Susquehannah and Bath Turnpike Road Company* v. *The People*, (15 *Wend.* 267.) The 17th section of the act incorporating that company, (*27th Sess. ch.* 71, 3 *Web. L. N. Y.* 547, 554,) is similar to the 17th section of the defendants' charter. Under that act the company were held to be indictable at common law for suffering their road to be out of repair. It was urged in that case, as it has been in this, that the statute remedy superseded that by indictment; but Bronson, J. in giving the judgment of the court, remarked, that when a statute contains no negative words, nor anything from which it can be inferred that the legislature intended to take away the common law remedy, the giving of a new remedy by affirmative words, without a negative expressed or implied, does not

take away the mode of redress which the common law has pro-
vided. (*Crittenden* v. *Wilson*, 5 *Cowen*, 165. *Almy* v. *Har-
ris*, 5 *John.* 175. *Farmer's Turnpike* v. *Coventry*, 10 *id.* 389.).
There are no negative words in the defendants' charter, nor any
expression indicating an intention to impair the common law
remedy. In *The People* v. *The Goshen Turnpike*, (11 *Wend.*
497,) this court held that an indictment was the proper remedy
against turnpike companies to enforce the penalty given by stat-
ute for permitting their roads to be out of repair. (1 *R. L.*
587, § 47.) The indictment may be either under the statute, or
at common law. (*See per Kent, Ch. in Rogers* v. *Bradbury*,
20 *John.* 742.)

The defendants' counsel insists that the Turnpike Company
are not indictable, and that if an indictment will lie at all, it can
be supported only against the town through which it runs. The
case of *The King* v. *The Inhabitants of Netherthong*, (2 *B. &
A.* 179,) is not applicable to this case. The question in that
case arose under a local act passed in 1768. That act author-
ized trustees to divert a prior existing road, and to cause it to be
repaired out of the money arising by virtue of that act, by such
persons as they should appoint. The act declared the new road
to be a public highway, and contained a proviso that nothing
therein contained should be construed to be a discharge of any
county, parish, township, &c. from the performance of statute
work upon, or otherwise repairing it, &c. The trustees had no
interest in the road, and the liability of the township was ex-
pressly reserved in the act.

In the present case, the turnpike was a franchise belonging to
the defendants. The charter is in the nature of a contract be-
tween the stockholders and the public. The former agree, in
consideration of the tolls granted to them, to construct the road
in a prescribed manner and to keep it substantially in that con-
dition, during the existence of the charter. A violation of their
duty is punishable by indictment at common law. It will be
time enough to consider the other remedies, when an attempt is
made to enforce them.

It has been strenuously urged that the court erred in exclud-

174        CASES IN LAW AND EQUITY        [July 1

President, &c. of Waterford and Whitehall Turnpike *v.* The People.

ing the evidence offered on the part of the defendants, that they had no funds with which to make the necessary repairs to the road.   The fact that commissioners of highways are not bound to build bridges, when not in funds to defray the expenses, as was held in *The People* v. *The Commissioners of Highways of the Town of Stuyvesant,* (7 *Wend.* 474,) affords no ground for this objection.   The commissioners are public officers, compelled, *under a penalty,* to hold the office when elected, and they derive no profit from bridges and public highways, which is not common to all.   Nor does the case of *Bartlett* v. *Crosier,* (17 *John.* 439,) aid the defendants.   That was a civil action brought against an overseer of highways, for an injury occasioned by his neglect to repair a bridge, and it was held that the action would not lie ; unless, indeed, it was shown that he had funds in his hands for that purpose, and wilfully omitted to apply them.   (*Id.* 457.)   But the reasoning of Chancellor Kent in the latter case, shows that in general an indictment will lie against public officers charged with the reparation of highways, for a wilful disregard of their duties.

The want of funds affords no legal excuse to the defendants. By accepting their charter, they impliedly engaged to fulfil all the duties thereby imposed.   A neglect of those duties subjected them to an indictment ; and their poverty, as a corporation, is no more a defence than the poverty of an individual is a defence to an action for a breach of contract, or to an indictment for a crime.

It was contended that the judge erred in refusing to charge the jury, that if the road had not been continued by the defendants substantially according to the act of incorporation, still they were not liable, if the jury should find that the road was safe and passable.   The object of their prayer was to raise the question, whether *a road safe and passable* could be indicted as for a nuisance.   The public had a right to require something more of the defendants, than that the road should be merely *safe and passable.*   It might be both *safe and passable,* though the defendants had contracted its width one half ; but it would cease to be the road which the defendants were bound to furnish the

public, and would be far less commodious.   To constitute a nui-
sance it is not essential that the road should be unsafe or im-
passable.   Any contracting or narrowing of a highway is a nui-
sance.   (1 *Russ. on Crimes*, 350.)   Any obstruction left in
the road, or omission to repair it, whereby it is less convenient
for public use, falls within the same category.   The public had
a right to have the road continued substantially in the same
manner, as to width and safety, which the charter required at its
first construction.   There was therefore no error in this refusal
to charge.

   With respect to that part of the road which was altered by
the state and carried over the canal, the proof offered would
have been admissible, had the indictment charged such altera-
tion as a nuisance.   The alteration had been made more than
twenty-five years before the indictment was found, and the fact
that the road crossed the canal was not complained of.   It was
referred to merely as local description.   It must be presumed that
the state made full compensation for all the injury they occa-
sioned the defendants; but whether they did or not was imma-
terial in this case.   The defendants can not be convicted for
carrying their road over the canal, provided they make the pas-
sage as safe and convenient as the nature of the ground will
admit.

   It is unnecessary to inquire what other remedies for a nui-
sance the public possess, besides the indictment at common
law.   There were no exceptions taken to the remarks of the
judge in his charge on that subject, and if there had been, they
would not have been well taken.   (*See the case of The People
v. The Kingston and Middletown Turnpike Road*, 23 *Wend.*
193, *and Same v. The President, &c. of the Bristol and Rens-
selaerville Turnpike Road, Id.* 222.)   Those were informa-
tions in the nature of a *quo warranto,* to enforce a forfeiture of
the charter for misuser

   The indictment was sufficient, and according to established
precedents.   (3 *Chit. Crim. L.* 594, 600.   *Arch. Cr. Pl.* 485.)
There is no error in the proceedings and judgment of the oyer
and terminer, and the judgment must be affirmed.

CADY, J. dissented from that part of the above opinion which relates to the question of challenges to jurors by the public prosecutor.

Judgment affirmed.

———————◆———————

SAME TERM.    *Before the same Justices.*