Upon the taking for a public highway, by the right of eminent domain, of a franchise to build and maintain a bridge, the proprietors are not entitled to compensation for the value of the bridge as a structure, but for the loss of their franchise only.

A bridge built under a franchise to build it and to take tolls thereon for seventy years, or until the tolls shall amount to a sum sufficient to reimburse the entire cost of building and maintaining it, with nine per cent. interest, becomes, upon the determination of the franchise, the property of the public, and the owners of the franchise are not entitled to compensation for the value of the bridge as a structure.

The acceptance by the mayor and aldermen and the common council of the city of Lowell, of a statute which is required to be accepted by the city of Lowell, is a legal acceptance by the city.

By the *St.* of 1824, *c.* 110, the Central Bridge Corporation were incorporated, and authorized to build a bridge across the Merrimack River between the towns of Dracut and Chelmsford; and directed, when it should have been built, to make a return into the office of the secretary of the Commonwealth of the actual expense of building it, and at the expiration of eighteen years another return of the amount of their receipts, expenditures and dividends; and were granted certain tolls for seventy years: provided, nevertheless, that the legislature, at the expiration of eighteen years, might regulate the tolls anew; and that whenever the receipts of tolls and income should have equalled the expense of building, repairing and sustaining the bridge, with nine per cent. interest, the bridge should revert to the Commonwealth for public use; or whenever the inhabitants of the towns at each end of the bridge should remunerate the proprietors for the expense of the bridge, deducting what might have been received for toll, it might be opened free of toll.   By the *St.* of 1843, *c.* 50, the proprietors were authorized to reconstruct their bridge, and directed to make a return into the office of the secretary of the Commonwealth of the actual expenses incidental to such reconstruction, and were authorized by that act, as amended by *St.* 1845, *c.* 31, to raise for this purpose a sum not exceeding $14,000; and it was declared that the sum of $10,000, "being a portion of the cost of the original bridge, not yet reimbursed and repaid to said proprietors under said original act," together with the sum expended in and about the reconstruction thereof, should thereafter constitute their capital stock; the tolls were regulated anew; with provisos like those in the original act: and this act was to take effect on acceptance within thirty days by the proprietors, and by the city of Lowell, of which that part of Chelmsford at one end of the bridge had become part.   *Held,*

(1.) That the *St.* of 1843, when so accepted, constituted a contract between the proprietors of the bridge and the city; and that the *St.* of 1857, *c.* 205, repealing so much of the *St.* of 1843, as declared that the sum of $10,000 of the original cost of the bridge had not been reimbursed and repaid to the proprietors, was unconstitutional and void.

(2.) That after the acceptance of the *Sts.* of 1843 and 1845, the rights of the bridge corporation were to be regulated thereby; and that in estimating the amount necessary to reimburse them, the account should be taken with annual rests, computing the gross amount of tolls received in each year, deducting the necessary charges and expenses, and thus ascertaining the net annual income; and that if this income was more than sufficient to pay nine per cent. upon the capital of the preceding year, the surplus, although actually paid out in dividends, was to be deducted from that capital, and the balance would form the capital for the following year.

Central Bridge Corporation *v.* City of Lowell.

(3.) That in determining the amount of capital not reimbursed, all moneys were to be allowed which had been expended by the bridge corporation, since the *St.* of 1843, in the conduct of their business and affairs, the payment of their debts and performance of their contracts, compensation to their directors and other officers, the prosecution and defence of suits at law, the representation of their rights and interests before the legislature, and for insurance against fire.

(4.) That upon the trial of a petition by the bridge corporation to recover damages for the subsequent laying out of their bridge by the city as a public highway under the right of eminent domain, their compensation must be estimated in the same manner; and that evidence that a less sum than $10,000 remained unpaid at the time of the passage of the *St.* of 1843 was inadmissible.

(5.) That the petitioners might show that a double charge of an item in their account books was made by mistake.

(6.) That evidence that the petitioners had made certain lands and their occupants free of toll, and allowed other persons to pass over the bridge at half toll, was inadmissible to charge the petitioners with fraud, and to make them account for the amount of tolls which they might have received.

(7.) That evidence that it was not the custom in other corporations to pay salaries to their directors was incompetent.

(8.) That the provisions of the statutes, requiring the petitioners to make returns into the office of the secretary of the Commonwealth, were directory only, and the failure to make such returns could not be given in evidence against them.

An order laying out as a public highway the bridge of a bridge corporation does not include by implication their toll-house lying without the limits of the highway.

The answer filed in behalf of a city, signed by its mayor and solicitor, in a suit in equity brought against it by a bridge corporation, is admissible in evidence against the city on the trial of a subsequent petition by the bridge corporation for the assessment of damages for laying out their bridge for a public highway.

A judgment which is not shown to have been extended on the records may be proved by the entries on the docket of the court which rendered it.

Upon the trial of a petition by a corporation for the assessment of damages for taking their franchise for a public highway, after they have put their records in evidence, their votes from those records may be read in evidence against them.

Pending a petition for the assessment of damages for taking a franchise for a public highway, the parties agreed upon an accountant to examine a number of books and vouchers, covering a considerable period, and that his computations and calculations might be exhibited as evidence to the jury on the hearing by either party, subject to legal exception, except as not being original evidence, and that the expenses thereof should be taxed like other costs. *Held,* that this evidence was admissible at a second trial had in consequence of the verdict rendered upon the first trial having been set aside for erroneous rulings in matter of law.

PETITION to the county commissioners of Middlesex for the assessment by a sheriff's jury of damages occasioned by the taking and laying out of the petitioners' bridge as a public street of the city of Lowell, depriving them of their bridge, abutments and piers, and franchise, and reducing the value of their toll-house and the lot of land on which it stood; for which

the city council had awarded nominal damages only, acting under the *St.* of 1853, *c.* 356, § 3, which is as follows :

" The city of Lowell are hereby authorized to enter upon, take and lay out the Central Bridge aforesaid as and for a town way or street, in the manner now provided by law for laying out town ways or streets in the city of Lowell; and they shall pay to the proprietors of Central Bridge, and to all other persons injured by such taking and laying out, the damages sustained by them, to be assessed and paid in the same manner as is now provided by law for the assessment and payment of damages occasioned by the laying out of town ways or streets in the city of Lowell."

Upon this petition a warrant was issued, and a trial had before the sheriff by a jury, who returned a verdict for the petitioners of $ 16,000 " for the bridge," $ 4,740.83 " for the franchise," and $ 1,002.47 " for interest " — in all, $ 21,743.30 — which was returned by the sheriff with a certificate of his rulings and refusals to rule, and of the respondents' exceptions thereto, to the court of common pleas, who at September term 1858 accepted the verdict; and the respondents appealed to this court. So much of the rulings given and requested, and of the arguments of counsel, as is material to the understanding of the questions decided, is stated in the opinion and the notes thereto.

*B. F. Butler & A. P. Bonney,* for the respondents.

*C. P. Huntington & B. Dean, (D. S. Richardson* with them,) for the petitioners.

SHAW, C. J. This is an important case, and involves points of considerable interest, and has been fully argued.

We will first consider a few leading points, which appear to us to lie at the foundation of the whole inquiry, and which have been most strenuously contested before us.

Several things are to be taken into consideration, which, being of a public nature, and well understood by all parties interested, need not be specified in detail. Such are the act of incorporation in 1825, incorporating the petitioners with power to build the bridge in question across Merrimack River at Bradley's Ferry between the towns of Dracut and Chelmsford,

and several succeeding acts, some general and some special. It is to be understood that, although originally the proprietors were to be remunerated for the cost of building and maintaining their bridge by a specified toll for the term of seventy years, yet from the outset there was a provision that after eighteen years the bridge might be redeemed for the use of the public, or, in other words, made free, upon payment to the proprietors of the amount of their original outlay, with nine per cent. annual interest, deducting what they had realized from tolls.

There were several changes of parties, by incorporating that part of the town of Chelmsford in which the southerly end of this bridge was situated, into the town, afterwards the city, of Lowell, and by annexing that part of the town of Dracut, in which the northerly end of the bridge lay, to the city of Lowell ; so that this same bridge, which originally lay between the towns of Dracut and Chelmsford, when it was built, is now wholly within the limits of the city of Lowell.

But without going more into detail in regard to these changes of parties by changes in municipal corporations, this case is to be taken as the common one of a rightful taking of this bridge for public use as a town way or street, by public authority, and by right of eminent domain, of a certain qualified property of the petitioners therein ; and it is the right of the petitioners, under the tenth article of the Declaration of Rights of the Constitution of Massachusetts, to receive " a reasonable compensation therefor." Such compensation not having been awarded by the city of Lowell on laying out this town way, the corporation have taken the proper course provided by law, to have a jury, under the proper officer, to pass their judgment on the question, what is such reasonable compensation, under correct directions in matter of law.

1. Almost at the commencement of the hearing, the petitioners offered evidence tending to prove the value of the bridge, as a structure, at the time of laying it out as a way in 1856. To this evidence the respondents objected, contending that the petitioners were only entitled to recover the cost of constructing, repairing and sustaining the bridge, deducting therefrom their

receipts for tolls and income ; and therefore that this value, though open to the respondents, is not now admissible for the petitioners. This the sheriff overruled, and admitted the evidence, and the respondents excepted.

The better to understand the full import of this admission of evidence, it will be convenient to look at the further rulings of the sheriff; and for this purpose we refer to the first, second, third, fourth and fifth prayers for instructions, asked for by the petitioners and given by the sheriff. Without repeating these in terms, it is sufficient to state that he instructed them "to find and give by their verdict the damages sustained by the petitioners by the taking and laying out of their bridge ; also by the destruction of their franchise"— by which he manifestly intends their right to take tolls — with interest from the day of the taking ; and to find and give the value of the bridge at what it was then worth. Indeed, the whole argument now goes on the assumption that the franchise and right to take tolls was, of itself, a valuable right and privilege taken ; but, independently of that, the petitioners were the owners of the bridge as a building or structure, to be valued according to its cost in labor and materials, and perhaps deducting something therefrom on account of wear and the deterioration caused by time — being the actual value of such a structure or building to any one having occasion to acquire it, and willing to pay the fair value for it. And the verdict itself assumes this basis of estimation, and gives one sum for the bridge, and another and distinct sum for loss of the franchise.

The court are all of opinion that this claim of the petitioners and direction of the sheriff were founded on a mistaken view of the rights of these corporations. The bridge, as a structure, was a means only for using the public way over water ; the way could not be used for land travel without a bridge, which was therefore necessarily incident to it. The remuneration of the proprietors for the cost of building, maintaining and repairing the bridge consisted in a right to take the tolls fixed, for the term of seventy years. At the expiration of that term, the way, with the bridge and all its fixtures, would revert to the

Commonwealth, and the right of the proprietors in it would cease.

When therefore the right to take toll ceases, whether by the original limitation of time, or by a redemption by payment of a certain sum pursuant to a right reserved by the act of incorpo ration, or when it is legally taken by the right of eminent domain, the bridge, together with all fixtures necessarily incident to the use of the way, passes with it to those who succeed and become entitled to it by reversion, by redemption, or by a lawful taking and appropriation of it to the use of the public.

In either of these cases, the right to erect the bridge over navigable water is not a separate right, independently of the franchise to establish the way; indeed it is a part of the franchise, and is within the grant, because it is necessary to the enjoyment of it, by facilitating travel over it, without which there could be no toll. Were it not thus necessary as a means, and the only means, of providing for land travel across the river, such a structure or building in the river would be a nuisance, for the taking away of which no damage could be claimed. Taking land for a way, already used as such, takes all things placed, fixed or existing upon it, adapted to its use as a public way, such as gravel, stone or wood paving, plankway, flagstones, bridges, culverts, guard or lamp posts, and all works erected on or connected with it for use, or rendering its use more safe and beneficial as a way. Even in the ordinary case of taking land for the first time as a public way, the proprietors of the land have only the right to remove buildings, trees and fences, and generally things not adapted to its use as a way, or not required for the supply of materials necessary or useful in making or repairing the way.

The proprietors themselves, by their charter, took no fee in the soil, but only an easement for a right of way for public use. Their whole beneficial interest consisted in the right to take the specified tolls until the grant should revert, or be redeemed, according to reservations therein made. This right of way, the right to build and maintain a bridge over the river, and the right to levy tolls, with their incidental and implied powers and privileges, constituted the entire franchise and qualified property of the proprietors.

The sheriff having, in various forms, instructed the jury that they might take into consideration the petitioners' right of property in the bridge, as a bridge or structure belonging to them, independently of their franchise, at the actual value of such a structure, we think the direction was erroneous, and the verdict must be set aside.

2. Another important question is, on what grounds or basis the "reasonable compensation" to be made to the petitioners, for the appropriation to public use of their qualified right and interest in this toll-bridge, according to the Constitution, is to be estimated. It cannot be placed upon any fanciful or arbitrary basis; it must be a just and reasonable compensation. It must depend upon the nature of the property to be taken, and the title of the proprietors to it.

In the present case, the right of the petitioners was by their original charter, accepted and thereby assented to by them, to take the tolls, as fixed by the charter, and liable after a certain period to be regulated by the legislature, for the term of seventy years, if not sooner redeemed. It was a franchise qualified and redeemable. Then, what is a just and reasonable compensation, for the appropriation to public use of such a franchise, is the question in fixing the damages in this case. It depends upon the provisions of law, all looking to the ultimate appropriation of this bridge to public use, by making it free. It was therefore provided by law, that when the receipts of toll and income should have amounted to a sum equal to the expense of building, repairing and maintaining said bridge, with nine per cent. interest on the cost, said bridge should revert to the Commonwealth for public use; and provided, also, that the towns of Dracut and Chelmsford might anticipate such period, by remunerating the proprietors for the expense of said bridge, deducting what they might have received for tolls. *St.* 1824, *c.* 110, § 3. By "remuneration," in this immediate connection, we understand a remuneration by the tolls, with nine per cent. interest on the original cost, deducting all necessary and reasonable expenses.

It is not now a question whether the city of Lowell has suc-

ceeded to the rights of Chelmsford and Dracut, because it is conceded that the city has not taken the bridge by virtue of such right originally reserved, but has taken it rightfully, by right of eminent domain ; and the true question is, what the petitioners, as grantees of this bridge, have lost by the appropriation of it as a town way.

It does appear however that both Dracut and Chelmsford have, in legal effect, assented to the taking of the bridge as a town way.  By the *St.* of 1851, *c.* 106, the right of Chelmsford in this bridge, in express terms, was transferred to the city of Lowell, if it had not virtually been so transferred before, by the setting off that part of Chelmsford in which the bridge lay, from Chelmsford to Lowell, by the *St.* of 1825, *c.* 112.  That part of Dracut also, in which the other terminus of the bridge was situated, was by the *St.* of 1851, *c.* 8, transferred to Lowell ; and by implication the local right of Dracut in the bridge passed with it.  And further, it appears by the indenture between Lowell and Dracut, that the latter corporation agreed to pay a part of the cost of laying out this bridge as a town way, and thereby expressed their assent, so far as any right remained in them.  So that this laying out cannot interfere injuriously with any statute right reserved to these corporations by the original charter, or by any subsequent act.

But the true point is, that by virtue of these grants the petitioners had a redeemable and determinable right in the franchise, including the right to take tolls, and the bridge and all its fixtures as incident thereto, determinable absolutely at the expiration of seventy years ; and determinable also whenever the tolls would amount to a sum sufficient to reimburse the entire cost of the bridge, (deducting the necessary charges annually from the said tolls,) with nine per cent. interest.  It would then become free, that is, become public and open, and placed in the same position in which it is now placed as a town way.

But what does this proposition imply ?  The proprietors are to be paid the whole cost of building the bridge, with liberal interest, from a public fund — for a toll-thorough levied on passengers on a highway is a public revenue — together with all

charges of maintenance and repair. Whose then is the bridge at the end of the term? does it belong to the public who have paid for it, or to the proprietors who have been liberally paid for it? The question seems to admit but of one answer.

This view is wholly inconsistent with the instructions given by the sheriff, being the instructions given upon several prayers of the petitioners, especially the first, second, third, fourth, fifth and seventh; and with the refusal to grant several prayers of the respondents, which were refused, especially the third, fifth, ninth, tenth, eleventh, thirty-third and thirty-fourth.

The court are of opinion that for these reasons the verdict must be set aside, and a new warrant issue. *

---

* The respondents cited *Perrine* v. *Chesapeake & Delaware Canal*, 9 How. 184; *West River Bridge* v. *Dix*, 6 How. 534; *The King* v. *Severn & Wye Railway*, 2 B. & Ald. 646; *Parks* v. *Boston*, 15 Pick. 148; *Commonwealth* v. *Wilkinson*, 16 Pick. 175; *Murray* v. *County Commissioners*, 12 Met. 458; *Rogers* v. *Bradshaw*, 20 Johns. 742; *Whiteford & Whitehall Turnpike* v. *People*, 9 Barb. 173; *Troy & Boston Railroad* v. *Lee*, 13 Barb. 169; *In re Furman Street*, 17 Wend. 649; *Giesy* v. *Cincinnati, Wilmington & Zanesville Railroad*, 4 Ohio N. S. 308, 331; *Boyd* v. *Brown*, 17 Pick. 461; *Gardner* v. *Field*, 1 Gray, 151; *Watt* v. *Potter*, 2 Mason, 84; *Pembroke* v. *Duxbury*, 1 Pick. 199; *Lowell* v. *Proprietors of Locks & Canals*, 7 Met. 1; *State* v. *Canterbury*, 8 Foster, 195; *Sts.* 1815, *c.* 71, § 7; 1824, *c.* 79, § 4; 1825, *c.* 164, § 4; 1826, *c.* 103, § 5. The petitioners cited *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 35–37; *Central Bridge* v. *Lowell*, 4 Gray, 474; *Tufts* v. *Charlestown*, 4 Gray, 537; *Commonwealth* v. *Hancock Free Bridge*, 2 Gray, 64; *Heard* v. *Middlesex Canal*, 5 Met. 86; *White* v. *South Shore Railroad*, 6 Cush. 412; *Charles River Bridge* v. *Warren Bridge*, 7 Pick. 371; *West River Bridge* v. *Dix*, 6 How. 534, 541, 546, 547; *Fletcher* v. *Peck*, 6 Cranch, 135; *Enfield Toll Bridge* v. *Hartford & New Haven Railroad*, 17 Conn. 454; *In re Flatbush Avenue*, 1 Barb. 286; and argued that the bridge as a structure, distinct from the right to levy tolls, was recognized in the special acts for constructing and reconstructing the bridge, and especially in the provision that the tolls should cease after seventy years, making no provision in regard to the structure itself after that period, although the corporation would not then cease to exist; in the *St.* of 1853, *c.* 356, § 3, providing for entering upon, taking and laying out the bridge as a structure, and not providing for the taking of all the property, corporeal and incorporeal; in the Rev. Sts. *c.* 44, §§ 12–18, as to taking franchises on execution and in the vote of the city of Lowell, taking the petitioners' property, which not only distinguished the structure from the franchise and right to levy tolls, but the bridge, as one portion of the material property, from the toll-house, another portion which was not taken.

3. Thus stood the rights of the petitioners, and of the public, including towns and other parties interested, by the act of incorporation in 1825. One obvious purpose of that act was to secure the right of the public to have the bridge free when the cost should be reimbursed, with nine per cent. interest, from the receipt of tolls. To facilitate the provision that the bridge should thus become free, and to enable the legislature to regulate the tolls, it was required of the clerk of the bridge corporation, at the expiration of eighteen years, to make a return into the office of the secretary of the Commonwealth, stating the amount of receipts, expenditures and dividends during that term of time. This of course, by necessary implication, required the corporation, by suitable means, to keep and preserve accounts of all such receipts and expenditures, in order that such true return might be made.

At or about the expiration of eighteen years from the act of incorporation, on the 23d of March 1843, an additional act was passed, pursuant to an authority reserved in the original act of incorporation. *St.* 1843, *c.* 50. One great purpose of this act was to regulate the tolls ; another, to limit the continuance of the charter to twenty years from the time this last act went into operation. It provided that $10,000, being a portion of the cost of the original bridge, not yet repaid, together with the sum to be expended in and about the reconstruction thereof, with a small deduction from said $10,000, should thereafter constitute the capital stock. It authorized them to raise money, not exceeding $9,000, by assessment, or by the creation of new shares. It provided for the remuneration of said $10,000, and the sum of money so to be expended for the reconstruction of the bridge, by tolls. It contained a similar provision to the former act, that upon the proprietors' receiving in tolls the amount of the capital stock, as thus constituted, and the expenses of repairing and maintaining the bridge, and nine per cent. interest, the bridge should revert to the Commonwealth for the public use; and a further provision that it might be sooner made free on reimbursement, as provided in the original statute. This act was to take effect when accepted by said

proprietors, and by the city of Lowell, at legal meetings of the respective corporations.

Upon this act the court are of opinion, First, That it constituted an agreement and contract between the city of Lowell and the Central Bridge Corporation, if accepted by them respectively.*

Secondly, That the acceptance by the mayor and aldermen and common council of the city of Lowell, in due form, was a legal acceptance by the corporation, because it was done by their duly constituted representatives. † All the powers of the city, as a municipal corporation, were vested in the city council, except those, if any, specially and expressly reserved by the charter to be exercised by the people. No such reservation applies to this case.

Thirdly, That the same act was duly accepted by the Central Bridge Corporation at a legal meeting.

---

* The respondents argued, that the declaration in the *St.* of 1843, *c.* 50, § 3, if it ever had any binding force upon any party, bound only the Commonwealth, and was not intended to, and could not, affect the towns, as against whom a different rule of computation was to be observed ; that, as against the Commonwealth, the petitioners were to receive the cost of the bridge, with nine per cent. interest ; and, as against the towns only, a remuneration which could at most include only the cost, with lawful or six per cent. interest ; that if the result of a reckoning, it was only with the Commonwealth, and for the purpose of fixing the future capital stock of the corporation, and determining the amount to be reimbursed in tolls before the bridge should revert to the Commonwealth ; but the towns had nothing to do with the capital stock, and under the original charter were to remunerate the petitioners for the expense ; and as to them the *St.* of 1843, § 4, provided, that " the said proprietors shall be reimbursed, and said bridge opened, according to the terms and by the authority granted in the original charter."

† The respondents argued, that as the charter of the city declared that the inhabitants of the town of Lowell should " continue to be one body politic, under the style and denomination of the *City of Lowell*," and provided for general meetings of the inhabitants ; (*St.* 1838, *c.* 128, §§ 1, 23 ;) a legal meeting of the corporation, required by *St.* 1843, *c.* 50, § 8, for the acceptance of this act, must be a meeting of the inhabitants, and that the mayor, aldermen and common council were only officers of the corporation, and not the corporation itself. The petitioners replied that by § 8 of the city charter, all the powers of the town or of its inhabitants as a municipal corporation were vested in the city council.

Fourthly, That the *St.* of 1857, *c.* 205, purporting to repeal part of the act of 1843, so far as the contract between the city of Lowell and the bridge corporation was concerned, was not within the proper scope of legislative authority, because it would operate to alter and change that contract, and in that respect was inoperative and void.*

By a subsequent act, *St.* 1845, *c.* 31, passed on the 10th of February of that year, the corporation were authorized to raise a sum not exceeding $5,000, in addition to the $9,000 authorized by the former act, for the purpose of defraying the excess above that sum in the cost of reconstructing their bridge and incidental expenses, and for rebuilding in part the stone piers and abutments, and protecting the whole structure by a permanent and substantial covering. Section 2 provided that the sum thus expended should constitute a part of the capital stock, in addition to the amount provided for in the former act; and that the proprietors in relation thereto should have the same rights

---

* The *St.* of 1857, *c.* 205, provides that so much of the *St.* of 1843, *c.* 50, " as recites, alleges or declares that the sum of ten thousand dollars of the original cost of the bridge therein named had not then been reimbursed and paid to the proprietors thereof, is hereby repealed." The respondents argued that neither the *St.* of 1843, nor the act to which it was in addition, contained any express provision limiting its duration, and the whole act was therefore subject to repeal; that this statute, having been passed since 1831, was subject to the reserved right of the legislature to alter, modify or repeal it; that the portion of it repealed by the *St.* of 1857 was merely an indirect, incidental relation of an assumed fact, which the legislature subsequently found to be untrue; and that the *St.* of 1857 was constitutional and valid; and cited Rev. Sts. *c.* 44, § 23; *Massachusetts General Hospital* v. *State Mutual Life Assurance Co.* 4 Gray, 227; *Roxbury* v. *Boston & Providence Railroad*, 6 Cush. 424; *McCracken* v. *Hayward*, 2 How. 608; *Bloomer* v. *Stolley*, 5 McLean, 158; *James* v. *Stull*, 9 Barb. 482. The petitioners argued that their charter, passed in 1825, was not subject to amendment, alteration or repeal by the legislature; that they were a corporation competent to contract with the Commonwealth; that the *St.* of 1843 was a contract with the Commonwealth, binding on the Commonwealth, relying upon which the petitioners had reconstructed their bridge and covered it at great expense, and sold their stock in considerable quantities; and that the *St.* of 1857 by its terms impaired the obligation of this contract, and was therefore unconstitutional, inoperative and void; and cited *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 1.

and powers, and be subject to the same conditions, as set forth in said act.

The court are therefore of opinion, that from and after the passage and acceptance of the acts of 1843 and 1845 the rights of the bridge corporation in their franchise and bridge were to be regulated by those acts; and their right was to take the tolls thereby fixed, until the net tolls should be sufficient to reimburse said capital of $10,000, and the cost of rebuilding their bridge, with nine per cent. interest, unless sooner redeemed, by reimbursing the same, with nine per cent. interest, according to the rights still reserved to that effect in the last mentioned acts. On such a reimbursement, we think the account should be taken with annual rests, computing the gross amount of tolls received each year, deducting the necessary charges and expenses ; thus the net annual income will be ascertained. If the amount is found more than sufficient to pay nine per cent. on the capital of the preceding year, the surplus, though actually paid out in dividends to the stockholders, is to be deducted from the capital of the preceding year, and the balance will form the capital of the following year. But the computation should be so made as to give the stockholders nine per cent. in years when the net receipt of tolls fell short of nine per cent. on the capital for that year, if there were any such, from the income of succeeding years, when it exceeded nine per cent., so as to give to the stockholders nine per cent. on the capital each and every year ; such capital being reduced each year by surplus of income, if any, from the preceding year. Such net income extends to all tolls received, and moneys received from all other sources, deducting repairs and all incidental expenses. And the court are of opinion, that the amount which would, upon such computation, be due to the bridge corporation, would be a just and equitable mode of estimating the just compensation due to the petitioning corporation upon the appropriation of their bridge to the use of the public as a town way.

4. One question of considerable importance presents itself on this subject, which seems to require a distinct consideration, and that is, the value of the toll-house and the lot of land on which

it stands, on the northerly side of the river and adjoining the bridge.

Originally, by the act of incorporation, it was obviously the intention of the legislature, assented to by the Central Bridge Corporation by accepting the charter, that this bridge should be redeemable and made free for the public, as soon as the proprietors should receive from tolls a sum sufficient to pay them, after deducting necessary expenses, the amount disbursed for the cost of building and maintaining the bridge, including land damages, if any, and all other charges, with interest at the rate of nine per cent. per annum. Such costs of building and expenses would, of course, constitute their capital; and if the net annual income should exceed nine per cent. on such capital, would be divided annually, and paid out to the stockholders but all such net receipts from tolls, beyond what would be necessary to pay nine per cent. annually to the stockholders, would be deducted from the capital, and the balance only stand as the capital for the ensuing year. The consequence would be, that if the annual net income should steadily exceed nine per cent., thus computed, it would gradually reduce the capital; and when thus wholly reduced, the bridge would become free. It would be free, revert to and become the property of the public, because the whole cost of it, with an ample remunerating interest, would have been paid to the proprietors who advanced such costs and expenses from a fund provided for them by the public.

Such was the object and policy of the act of incorporation of 1825. To this end the clerk of the corporation was required to make a return to the secretary's office of the cost of the bridge, and also the expenses of repairs and maintenance, and also of the income from tolls; and the right of the legislature was reserved, at the expiration of eighteen years, to alter the tolls granted. It appears by the evidence reported, that a certificate, dated October 15th 1827, was filed in the secretary's office on the 19th of February 1829 by James Tyler, proprietors' clerk, of the cost of building the bridge; but no further return was made, according to law, either of receipts or expenditures, before the passage of the *St.* of 1843, *c.* 50.

This act, as heretofore stated, amongst other things — in the absence of the authentic return intended to be made by the corporation by their clerk — liquidated and fixed the portion of the cost of building the bridge, not then reimbursed and repaid to the proprietors, at $10,000. This act, having been accepted by both corporations, confirmed and established this liquidation: like a settled account, it precluded further inquiry into the items of which it was composed.

How then does this view affect the question of the toll-house and lot? We think the evidence shows that the lot was purchased and the toll-house built before 1843; and, if so, it was a necessary expenditure out of their corporate funds, and constituted a part of the entire sum, of which $10,000 was the unpaid balance. It is obvious therefore that if this toll-house and lot were not taken as part of the town way, they still remain the property of the petitioners, and the value of them should be deducted from the damages; otherwise, they would hold them to their own use, to be sold for their own benefit, or otherwise, and also be paid for them, which would be manifestly unjust.

We have looked at this point with the attention it deserves. The charter of the petitioners, authorizing them to take tolls, authorized them, by necessary implication, to acquire and maintain a toll-house; it became their property, and was a proper charge upon their corporate funds. Has it been taken by taking their bridge for public use?

In the act of laying out this town way by the city of Lowell, it is clear that the toll-house and lot are not expressly taken. The terms of the resolve are, that the bridge called Central Bridge, in said Lowell, across the Merrimack River, "and extending from the county road in said Lowell on the southerly side of said river, called Bridge Street, to the county road on the northerly side of said river in said Lowell, also called Bridge Street, together with all the abutments and piers of said bridge, shall be and the same are hereby taken, laid out, appropriated and established as and for a town way." This is repeated, in a different form of words, in the same resolution, not varying the description in substance, but declaring the town way to be of

the width of said bridge, in the same course therewith, over and upon said bridge, and across said river. No expression extends it in width beyond the bridge and abutments.

Nor do we think it is included by implication. A toll-house was necessary to the original proprietors; they could not exercise their right without it. The toll-house must necessarily be out of the limits of the bridge, but adjoining them. They therefore had authority, by necessary implication, to purchase or build it out of the corporate fund.

But when the bridge came to be laid out as a public way, on which no toll was to be collected, no toll-house was necessary. It does not therefore come within the principle hereinbefore stated, that whatever of building, as bridge, culvert, paving and the like, on land laid out as a public way, more especially such as are specially adapted to its use as a public way, pass with it to the public. The toll-house was *extra viam*, not within the limits of the town way, not necessary or useful to it as a public way; it did not therefore pass by the taking, and still remains the property of the petitioners.

Indeed, on a re-examination of the petition of the proprietors of the bridge for damages, they do not claim that the toll-house has been taken, though it is repeatedly mentioned as their property, and one item in their claim for damages is, the diminution of the value of that property. As this toll-house and lot have not been taken by the act of the mayor and aldermen of Lowell in taking the bridge as a town way, and still remain the property of the proprietors of the bridge, though formerly paid for and the cost thereof reimbursed to the proprietors, and included in the $10,000 capital, as established by the act of 1843, the present fair value of this property must be deducted from the damages which the proprietors would be otherwise entitled to receive, unless some other arrangement is made by consent. We would suggest, for the consideration of the parties, the propriety of disposing of this small parcel of estate by auction, at which its actual value would be likely to be offered. And, to preclude all question of title, the petitioners as owners might make the conveyance, and the city join by releasing all claim.

The proceeds of sale might then be taken as the actual value, and deducted from the damage sustained by the proprietors.

If no such arrangement is made, we think this toll-house and lot should be estimated at their present actual cash value, for use as a house or shop, or for building on, or for any other purpose, other than a toll-house, to which they cannot now be applied; and such estimated value be deducted from the petitioners' damages.*

5. Several other points were discussed, which with a view to another trial it may be proper briefly to notice, though not necessary to the present decision.

The respondents objected to the reading of their answer to a bill in equity between the same parties in a former case. † We think the respondents' former deliberate declarations were competent and rightly admitted; and that the admission of dockets of judgments, it not appearing that the judgments had been entered *in extenso* in books of record, was also correct. ‡

We think the respondents should have been permitted to give in evidence votes of the petitioners from their records, the same

---

* The petitioners argued that both parties conceded that the toll-house had not been taken by the respondents; that the sheriff permitted no damages to be given for injury to the toll-house, but only for taking the bridge structure itself, and for injury to the franchise; and that the loss of profits from the toll-house in connection with the bridge under the charter, or the loss of the use of it for that purpose, even though it formed a part of capital not reimbursed, was rightly submitted to the jury, because the privilege of the use of it secured by the charter was part of the franchise destroyed.

† This was the answer signed by the mayor in behalf of the city, and countersigned by the city solicitor, in the suit of *Central Bridge* v. *Lowell*, 4 Gray, 474. It was now argued for the respondents that the solicitor and agent who made the answer had no authority to make any admission or declaration to bind the city for any other purpose or proceeding than the suit in which the answer was made.

‡ These were in various suits at law and equity between the same parties. The respondents contended that the only competent evidence of other suits was a duly certified copy of the record; and cited 1 Greenl. Ev. § 513. The petitioners cited *Pruden* v. *Alden*, 23 Pick. 187; *Benedict* v. *Cutting*, 13 Met. 186; *Read* v. *Sutton*, 2 Cush. 115; *Boardman* v. *Kibbee*, 10 Cush. 549; *Tillotson* v. *Warner*, 3 Gray, 577.

records having been offered in evidence by themselves and admitted by the sheriff.

The directions of the sheriff were right, in not receiving, on motion of the respondents, evidence of the receipts and expenditures of the bridge corporation prior to 1843, and all computations and estimates thereof, with a view of proving that the sum of $10,000 did not remain due and unpaid as part of the cost of said bridge; and in ruling that the sum of $10,000 was to be taken, for the purpose of this inquiry, as the sum then unpaid to the proprietors, and that proof and estimates of such particular receipts and expenses were immaterial and incompetent. This includes the rejection of the testimony of Elizur Wright, of Stone and Eastman, bridge-builders, and the modes of keeping and auditing accounts prior to the act of 1843.

The admission of the testimony respecting the double charge of $1,000 was correct, as having a tendency to repel a charge of fraud upon the corporation or its officers.*

The respondents offered evidence to show that prior to 1843 the corporation had made certain lands and the persons occupying them free of toll, and had permitted the inhabitants of Dracut to pass at half toll, (with a view of fixing a charge of fraud on the corporation,) and insisted that the corporation should be charged with the amount of tolls which they might have received. This evidence, we think, was rightly rejected. The charge of fraud is far too vague, if indeed it would. be competent for a jury, in assessing damages, to try such ques

---

* It appeared from inspection of the petitioners' books, and the computations of an accountant who had been agreed upon by the parties, that one item of expense, amounting to $1,000, had been charged by and allowed to the petitioners twice. For the purpose of explaining this charge, the sheriff, against the respondents' objection, allowed the petitioners to ask their treasurer, after he had been called as a witness and had been cross-examined, whether he put this charge to the account of capital, believing that he had a right so to do; whether he intended that this entry should represent a double charge; and whether he personally approved or disapproved of it. The accountant afterwards testified that he had amended his computations by striking out this item

tion.   As an expedient for promoting settlement and increasing
the revenue of the bridge from tolls, this was left wholly to the
discretion of the corporation.   The whole management of the
bridge, its revenues and expenditures, was left by the legislature
to the corporation, their directors, officers and agents; and fraud
is not to be imputed to them but upon the strongest charge and
proof.

Evidence of custom in sundry other corporations not to pay
salaries or other compensations to directors for services was, we
think, rightly rejected.   Whether such compensation, in the
particular case, was reasonable, was a question of fact for the
jury, depending on the nature and amount of such services, and
other circumstances; and this could not be aided by the usage
of corporations so numerous and various.

The respondents objected to any proof of expenditures for
the bridge, because there was no return to the secretary's office.
If this objection applies to expenditures before the act of 1843,
it is immaterial, for reasons already given.   If to those since, it
is doubtful whether the provision in the charter required any re-
turn after 1843, the expiration of eighteen years from the char-
ter.   If it remains in force, not repealed by implication, it is
directory only, not conditional.   But, by necessary implication,
the *St.* of 1843 required the corporation to keep an account both
of receipts and expenditures, and be prepared to produce it.
The burden of proof is on them; and all presumptions are to
be taken most strongly against them, if such account was not
kept.

We think the sheriff was substantially right in giving the in-
structions prayed for in the eighth and ninth prayers of the peti-
tioners, that, in determining the amount of capital not reim-
bursed, all sums are to be allowed, which were expended by the
corporation from their corporate funds since March 1843, in the
conduct of their corporate business and affairs, payment of debts,
and performance of contracts, duly incurred and made under its
charter; also for the compensation of directors, officers and
agents, if reasonable, for the prosecution and defence of suits
for the purpose of protecting their rights and interests, for the

representation and defence of their rights before committees of the legislature, and for insurance against fire.*

Most of the other instructions given on the prayer of the petitioners were, we think, erroneous, for the reasons hereinbefore expressed.

Several of the instructions prayed for by the respondents and refused by the sheriff, in our opinion, ought to have been given, on grounds and for reasons hereinbefore mostly stated. The fifth clearly and succinctly states the true ground of inquiry before the jury, also the eleventh and twelfth. The thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth and nineteenth were rightly refused. The twentieth is not material. The twenty-first and twenty-second were rightly refused.†
Several others relate to matters of fact and are immaterial.

*Judgment of the court of common pleas accepting the verdict reversed, and ordered that a mandate go to the county commissioners to issue a new warrant for the assessment of the petitioners' damages.*

---

* The respondents argued that compensation paid to directors was not an expense of maintaining the bridge, but of keeping up the corporation, and of taking care of and administering their income ; and that insurance against fire was not an expense of maintaining the bridge, but enured to the benefit of stockholders only, and not of the Commonwealth or the public.

† These instructions, requested by the respondents, were as follows:

" Fifth. By the terms of the charter of said corporation, and the acts in addition thereto, the bridge would revert to the Commonwealth whenever the tolls collected would have amounted to a sum equal to the capital stock of the proprietors, together with interest thereon at the rate of nine per cent. per annum, and the repairs and expenses of maintaining said bridge ; and the property taken being only that which would in such event revert to the Commonwealth, the petitioners can recover no greater sum in damages than the amount which remains, unpaid to them by the tolls collected, of their capital stock and interest thereon at the rate of nine per cent. per annum, and the repairs and expenses of maintaining said bridge."

" Eleventh. The petitioners are not entitled to any damages, under this process, beyond the amount of the expense of building, repairing and sustaining, reconstructing and maintaining, and rebuilding in part the stone piers and abutments, and covering said bridge, and expenses incidental thereto, and interest on the first cost, and on the cost of reconstructing, rebuilding and covering

The parties afterwards agreed that the toll-house and the lot on which it stood should not be taken into consideration by the jury; that the petitioners should convey all their interest therein to the city; and that interest on the value thereof, to be fixed by an appraiser, should be deducted from the verdict.

Upon a second trial before the sheriff, the petitioners alleged exceptions to his rulings, a verdict of $17,000 was returned for the petitioners, and accepted by the superior court at September term 1861, and the petitioners appealed to this court, before whom the case was argued in January 1862.

*J. G. Abbott & Dean,* (*Richardson* with them,) for the petitioners.

*T. H. Sweetser,* for the respondents.

---

as aforesaid, and expenses incidental thereto, at the rate of nine per cent. per annum, deducting therefrom the amount collected from tolls, unless the jury shall find that the petitioners sustain some damage other and different from what they would have sustained if said bridge had reverted to the Commonwealth for public use.

" Twelfth. Said petitioners are not entitled to any compensation as damages, under this process, beyond the expense of said bridge, deducting what has been received for toll, unless the jury shall find that they sustain some damages other and different than the loss of said bridge and the right to toll.

" Thirteenth. In order to ascertain said amount, it is competent for the jury to consider and determine what was the first cost of said bridge, and the expense of repairing, sustaining, reconstructing and maintaining, rebuilding and covering, and the expenses incidental thereto as aforesaid, and what has been received by said corporation from tolls since the bridge was first opened for travel.

" Fourteenth. The burden is upon the petitioners to prove the amount of all the last named items of expense."

The fifteenth, sixteenth and seventeenth instructions requested by the respondents were in accordance with the positions stated *ante,* 116, 117, *notes.*

" Eighteenth. In ascertaining the amount for which said city and towns, or either or any of them, were entitled to have said bridge opened free of toll, no interest is to be computed on the expense of said bridge.

" Nineteenth. If in ascertaining the last named amount any interest is to be computed, the same is to be at the rate of six per cent. per annum.

" Twentieth. The return made by James Tyler, and filed in the office of the secretary of the Commonwealth on the 19th of February 1829, was not a compliance with the terms of the petitioners' charter, requiring a return to said office of the actual expense of building said bridge.

Hoar, J. It will be unnecessary to consider in detail the numerous exceptions which were taken to the instructions given by the sheriff to the jury upon the second trial of this case, and to his refusal to give instructions which were asked by the petitioners, because the whole groundwork upon which the trial proceeded seems to have been erroneous. The rule for the estimate of the petitioners' damages, given in the opinion of this court, upon ordering the first verdict to be set aside, was intended as the practical rule to be adopted upon a new trial, and should have been given to the jury by the sheriff. But it appears to have been entirely disregarded. If it had been adhered to, most of the questions which are now presented would not have arisen.

That rule was adopted after a very full and careful consideration of the whole subject; and the elaborate discussion of the various points presented on the first trial, contained in the opinion prepared by the late chief justice, renders it needless to go over them again. A construction was there given to the several statutes affecting the property of the petitioners, and the taking

"Twenty-first. If the jury find that no other return was ever made or returned to the office of the secretary of the Commonwealth, for or on behalf of the petitioners, they are not entitled to recover the expense of building said bridge, or the subsequent expenditures for repairing or sustaining the same, nor the expenses of reconstruction and expenses incidental thereto." The respondents argued that a neglect to make the returns required by the statutes subjected the petitioners to liability to be deprived of their charter, and so diminished the value of their franchise.

"Twenty-second. It having been the usage of said corporation" (as had appeared in evidence) "to divide the net receipts from the tolls among the stockholders quarterly, the jury, in computing interest on the cost of said bridge, and on the cost of reconstructing and covering the same, should make rests as often as quarterly, whenever said receipts exceed the expenses of repairing and maintaining said bridge, and the interest computed up to such rests." The respondents cited *Gibson* v. *Crehore*, 5 Pick. 161; *Reed* v. *Reed*, 10 Pick. 398; *Dean* v. *Williams*, 17 Mass. 417; *Williams* v. *Houghtaling*, 3 Cow. 86, and cases cited in note. The petitioners contended, and the sheriff ruled, "that in determining the amount of capital stock not reimbursed, the calculation of nine per cent. is to be made without rests during the time covered by the act of 1843, and not with annual or quarterly rests."

of it for public use, which seemed to us just, and adapted to secure the rights of the petitioners and of the public. And when in that opinion it was stated, that the mode of estimating the damages, there pointed out, "would be a just and equitable mode of estimating the just compensation due to the petitioning corporation upon the appropriation of their bridge to the use of the public as a town way," the court meant to be understood, and now desire expressly to state, that it is *the* just and equitable mode; the mode which the law requires; the only mode by which the jury can be saved from wandering into regions of the most uncertain and unsatisfactory conjecture; the rule practically applicable to the case, and which is to be applied to it in any future trial that may be had.

This decision disposes of most of the questions of evidence, as well as the other questions raised by the bill of exceptions. But with a view to the convenient direction of another trial, we have considered a question of much practical importance, namely, the ruling of the sheriff as to the evidence of George Heywood, an accountant agreed on by the parties, and certain computations made by him in pursuance of that agreement. *

---

* This agreement was signed by the counsel for the parties before the first trial, entitled " In the matter of the petition of the Central Bridge Corporation, now pending before a sheriff's jury at Lowell," and so much of it as related to the accountant was as follows :

" It is further agreed that all books and papers of said bridge corporation and in existence shall be produced before George Heywood, Esquire, of Concord, Massachusetts, who shall inspect the same and all other vouchers produced before him by either party, and state all accounts that shall be desired by either party, and make all computations and calculations desired by either party, upon any basis submitted by either party, and prepare copies of the same for both parties, and shall, so far as possible, from books, papers and vouchers, by a careful examination, ascertain and report what each and every item, either of income or expenditure, claimed by either party, was expended for, or from what source derived, and on what account the same was expended, charged or credited, so as to present a full synopsis, so far as the same may be gathered from any of said accounts or vouchers, of the objects, either of expenditure or source of income, claimed or requested by either party ; and also to report what items, either of such income or expenditures, are unvouched for.

" And it is further agreed that no witness shall be heard by the said Hey-

This evidence was offered by the petitioners, and excluded on the ground that the agreement was made solely with reference to the former trial, and not for any other trial of the case. We are of opinion that this was not the intention of the parties; and that the evidence should have been admitted. The agreement does not specifically refer to more than one trial; but it is of such a nature, and upon such a subject matter, that we think it was meant to apply to the final and decisive trial of the issue, and not to the first attempt at a trial only, which might prove to be a mistrial. The computations were to be made from numerous books and vouchers, covering a considerable period of time, and could not well be made by the jury. The agreement was not to serve a temporary purpose, or to supply the place of better evidence not then accessible. It was a reasonable and proper one, apparently almost essential to the intelligent disposition of the cause, and which the court, if it had the power, would probably have ordered, if the parties had not consented to it.

*Verdict set aside, and a new warrant to issue.*

wood as accountant, except to verify and authenticate any voucher, if any one shall be disputed.

" And it is further agreed that either party may be heard before the accountant upon any item, or to submit any suggestion, upon reasonable notice to the other party to be present, and no such suggestion shall be heard except upon notice to the other party to be present.

" And it is further agreed that the results, reports, computations and calculations of the accountant, as above provided for, may be exhibited as evidence to the jury upon the hearing, by either party, subject to every legal exception as to competency or relevancy, except that they are the results of an examination of accounts and vouchers, and not original evidence.

" And it is further agreed that the expenses of said hearings and accountant, to be certified by him, shall be taxed as other items of costs are taxed in said cause."